489 A.2d 1317

**The PRESBYTERY OF BEAVER–BUTLER OF the UNITED PRESBYTERIAN CHURCH IN the UNITED STATES of America, et al., Appellees,**

v.

**MIDDLESEX PRESBYTERIAN CHURCH, et al., Appellants.**

Supreme Court of Pennsylvania.

Argued Sept. 13, 1984.

Decided April 3, 1985.

256

Roger C. Wiegand, Kenneth C. Kettering, Reed, Smith, Shaw & McClay, Pittsburgh, for appellants.

Tom P. Monteverde, Jean C. Hemphill, Philadelphia, for amici curiae Presbyterian Church of Coatesville, J.R. Miller Presbyterian Church, Presbyterian Congregation of Faggs Manor.

William B. Ball, Harrisburg, for amicus curiae Pa. Catholic Conference.

Gregory M. Harvey, Morgan, Lewis & Bockius, Philadelphia, Lee C. McCandless, Butler, for appellees.

Ned J. Nakles, Latrobe, for Western Pa., W.Va. Synod et al.

W. Jack Williamson, Williamson & Williamson, Greenville, Ala., for Presbyterian Church in America.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

McDERMOTT, Justice.

This is a dispute over the ownership of church property. The issue presented is whether the members of a local church which has been affiliated with a national denomination can retain ownership of the assets and property of that local church after having terminated their membership in that denomination.

The principal appellant[1] is the Middlesex Presbyterian Church ("Middlesex"), which is a Pennsylvania non-profit corporation, incorporated in 1907. The primary appellee[2] is the Beaver-Butler Presbytery of the United Presbyterian Church in the United States of America representing the

1. The officers of Middlesex were also named parties.
2. Also named as plaintiffs below were the "Administrative Commission" appointed by that Presbytery; and the "Middlesex United Presbyterian Church in the United States of America," an unincorporated association of unnamed individuals who oppose Middlesex' departure from the denomination.

interests of the United Presbyterian Church in the United States of America (UPCUSA). UPCUSA is a nation-wide religious denomination which was formed in 1958 by the merger of the Presbyterian Church in the United States of America, and the United Presbyterian Church in North America.

From its inception Middlesex was a participating church in the Presbyterian Church in the United States of America. Upon an organizational merger in 1958, Middlesex became a member church under the banner of UPCUSA, and remained so until its disaffiliation in April, 1981. That separation was effected by a corporate charter amendment whereby the membership of Middlesex voted to disaffiliate from UPCUSA;[3] and it was that decision which precipitated the present controversy.

The original complaint in equity was filed by appellees on July 31, 1981, in the Court of Common Pleas of Butler County. Therein appellees sought delivery of all church property, an accounting of all church assets, and an injunction against the seceding members from in any way using or dissipating the assets of the church. Defendants, appellants herein, filed preliminary objections to that complaint.

Thereafter, on September 14, 1981, appellees filed a second complaint in equity, seeking to secure the right of those members who did not vote to secede to utilize the church property for worship while the original litigation was proceeding. On that date a special injunction was issued *ex parte* and appellants were enjoined from using the property in any manner inconsistent with the dictates of the central body, i.e., the Beaver-Butler Presbytery. On September 18, 1981, a hearing was held on this injunction. On September 21, 1981, the injunction was dissolved, without prejudice to the resolution of the parties' rights in the original action.

On November 10, 1981, appellants, defendants below, filed their answer to the original complaint and new matter,

---

**3.** This action followed a special meeting on April 6, 1981, of 156 of the 271 members of the Middlesex congregation at which 125 members voted to authorize such an amendment.

responding that they never agreed to surrender title to their property to the national organization. Following the completion of discovery, both sides moved for summary judgment. The Honorable John C. Dillon, P.J., rendered summary judgment in favor of Middlesex, finding no original agreement of trust placing the local church property in the control or ownership of the national church. His findings were affirmed by a court *en banc,* and a final decree was entered, which, upon appeal to the Commonwealth Court, was reversed. 80 Pa.Cmwlth.Ct. 211, 471 A.2d 1271. We allowed appeal, and now reverse the Commonwealth Court.

## I

A dispute among members of a religious denomination over the ownership of church property is not without precedent. Over a hundred years ago the Supreme Court of the United States was faced with a dispute in a southern church over the issue of slavery. In *Watson v. Jones,* 80 U.S. 679, 20 L.Ed. 666 (13 Wall. 1871), members of the Walnut Street Church of Louisville, Kentucky, fell into conflict when the national body, the Presbyterian Church of the United States, required their members to disavow slavery as a moral evil. Dissidents in the Walnut Street Church refused compliance and seized the local church. The national body of the Presbyterian Church brought suit to regain possession of the church property. The Supreme Court in an oft-cited case laid down a rubric for civil courts that has been honored, enforced, and enlarged ever since. The *Watson* Court defined what has come to be honored as the "deference rule". They said in 1871:

> whenever the *questions of discipline, or of faith, or ecclesiastical rule, custom, or law* have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them in their application to the case before them. (Emphasis supplied.)

*Id.,* 80 U.S. at 727. While the *Watson* Court did not fasten their rule to the First Amendment, it was so profound a

wisdom that subsequent courts found it a matrix for their First Amendment considerations.

The "deference rule", as the *Watson* ruling is familiarly known, was the beginning of an evolution from a previous doctrine known as the "departure from doctrine" rule, which had allowed courts to determine property rights if they found that a church body had departed from or changed their theological doctrines as to become something different from the intentions of their founders or their members.

The wisdom of the *Watson* Court is as clear now as it ever was: the right to practice one's belief and worship as one chooses is so deep a root of our constitutional culture that a court, even one with the best intentions, can be no more than a clumsy intruder into the most delicate and sensitive areas of human life. When Caesar enters the Temple to decide what the Temple believes, he can leave behind only his own views. The view of a court as to who are heretics among warring sects is worth nothing, and must count as nothing if our cherished diversity of religious views is to prevail.

The "deference rule" of *Watson* became a postulate of the First Amendment in *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952). In *Kedroff*, the New York legislature intervened by legislative act to settle the ownership of the property of the Russian Orthodox Church in America. The New York legislature decided that since the Czar of Russia was no more, the orthodoxy of the Orthodox Church of Russia had fallen among infidels, depriving the Patriarch of Moscow of the authority to appoint hierarchs of the church in New York.

The Supreme Court, loathe to interfere even upon so inviting a subject, maintained their rule that a doctrinal dispute belonged to the church authorities, even those in Moscow, and struck down the legislative Act of the New York Assembly as an unconstitutional intrusion into religious discipline. *Kedroff* locked *Watson* to the First Amendment and reaffirmed the "deference rule". Quoting *Watson*, the court said:

In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if anyone aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.

*Kedroff v. St. Nicholas Cathedral, supra,* at 114, 115, 73 S.Ct. at 153, 154. For themselves the court concluded:

Ours is a government which by the "law of its being" allows no statute, state or national, that prohibits the free exercise of religion. There are occasions when civil courts must draw lines between the responsibilities of church and state for the disposition or use of property. Even in those cases when the property right follows as an incident from decisions of the church custom or law on ecclesiastical issues, the church rule controls. This under our Constitution necessarily follows in order that there may be free exercise of religion.

*Id.* at 120, 121, 73 S.Ct. at 156, 157. (Footnote omitted.)

■ All disputes among members of a congregation, however, are not doctrinal disputes. Some are simply disputes

as to meaning of agreements on wills, trusts, contracts, and property ownership. These disputes are questions of civil law and are not predicated on any religious doctrine. While it is true that parties may agree to settle their disputes according to their own agreed fashion, the question of what they agreed to, or whether they agreed at all, are not doctrinal and can be solved without intruding into the sacred precincts. From this consideration has evolved what is called the "neutral principles approach" delineated in *Presbyterian Church in the United States v. Blue Hull Memorial Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969), where the rule was carefully announced.

Thus, the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without "establishing" churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. Because of these hazards, the First Amendment enjoins the employment of organs of government for essentially religious purposes, *Abington School District v. Schempp*, 374 U.S. 203 [83 S.Ct. 1560, 10 L.Ed.2d 844] (1963); the Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine.

*Id.,* at 449, 89 S.Ct. at 606. *See, Maryland & Virginia Eldership v. Church of God at Sharpsburg, Inc.,* 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970).

In *Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979), the Court went on to argue the merits of this approach.

> The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accomodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice. Furthermore, the neutral-principles analysis shares the peculiar genius of private-law systems in general—flexibility in ordering private rights and obligations to reflect the intentions of the parties.

*Id.* at 603, 99 S.Ct. at 3025.

Since *Jones,* we note that a number of our sister state jurisdictions have adopted this neutral view. *See Presbytery of Riverside v. Community Church of Palm Springs,* 89 Cal.App.3d 910, 152 Cal.Rptr. 854, cert denied 444 U.S. 974, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979); *Jones v. Wolf,* 241 Ga. 208, 243 S.E.2d 860 (1978), *vacated* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775, *reaffirmed* 244 Ga. 388, 260 S.E.2d 84 (1979), *cert. denied,* 444 U.S. 1080, 100 S.Ct. 1031, 62 L.Ed.2d 763 (1980); *York v. First Presbyterian Church of Anna,* 5th Dist., 130 Ill.App.3d 611, 85 Ill.Dec. 756, 474 N.E.2d 716 (1984); *Maryland & Virginia Eldership v. Church of God,* 249 Md. 650, 241 A.2d 691 (1968) *vacated* 393 U.S. 528, 89 S.Ct. 850, 21 L.Ed.2d 750, *reaffirmed* 254 Md. 162, 254 A.2d 162 (1969), *app. dismd.* 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970); *Presbytery of Elijah Paris Lovejoy v. Jaeggi,* Mo. 682 S.W.2d 465 (1984); *First Presbyterian Church of Schenectady v. United Presbyterian Church of the United States of America,* 62 N.Y.2d 110, 464 N.E.2d 454 (1984); *Christensen v. Roumfort,* No.

83 CA. 124, Ohio Ct. of Appeals 7th Dist., 20 Ohio App.3d 107, — N.E.2d —— (1984); *Foss v. Dykstra*, 342 N.W.2d 220 (S.D.1983). *See also, Trinity Presbyterian Church v. Tankersley*, 374 So.2d 861 (Ala.1979), *cert. denied*, 445 U.S. 904, 100 S.Ct. 1079, 63 L.Ed.2d 319 (1980).[4]

It is exactly these principles of deference and neutrality that compete in the instant case. UPCUSA insists upon the principle of deference, arguing that they are the final ecclesiastical tribunal, and hence their decision binds. Middlesex argues that they never subscribed to an agreement surrendering their property to the national church, and submit that under neutral principles the question is not doctrinal but a civil question of trust and contract.

The Commonwealth Court chose to accept that the question was one of deference and yielded the issue to the judicature of UPCUSA. We believe, under the circumstances, they went further than required. Indeed they seemed to have mandated deference simply because there existed a judicature in the national church body. They would have been correct if the issue was doctrinal, it however is, whether there ever existed an agreement at all: an issue that requires no doctrinal exegesis.

The error of the Commonwealth Court resulted from relying upon the broad language of some of the prior decisions of this Court, without taking into account the context in which that language appeared. Most notable

**4.** We recognize that the acceptance of this neutral view has not been unanimous. *See, e.g., Mills v. Baldwin*, 362 So.2d 2 (Fla.1978) *vacated*, 443 U.S. 914, 99 S.Ct. 3105, 61 L.Ed.2d 878 (1979) *reinstated* 377 So.2d 971 (Fla.1980) *cert. denied* 446 U.S. 983, 100 S.Ct. 2964, 64 L.Ed.2d 839 (1980); *Fonken v. Community Church of Kamrar*, 339 N.W.2d 810 (Iowa 1983); *Bennison v. Sharp*, 121 Mich.App. 705, 329 N.W.2d 466 (1982); *Tea v. Protestant Episcopal Church*, 96 Nev. 399, 610 P.2d 182 (1980); *Protestant Episcopal Church v. Graves*, 83 N.J. 572, 417 A.2d 19 (1980) *cert. denied* 449 U.S. 1131, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981); *Church of God of Madison v. Noel*, 318 S.E. 920 (W.Va.1984). However we are not persuaded by the reasoning of these decisions to alter the course which we set in *Western Pennsylvania Conference of United Methodist Church v. Everson Evangelical Church*, 454 Pa. 434, 312 A.2d 35 (1973), *app. dismd.* 416 U.S. 923, 94 S.Ct. 1921, 40 L.Ed.2d 279 (1974). *See* pp. 264–267 *infra.*

among the various citations was that court's reliance on the following language from *Western Pennsylvania Conference of United Methodist Church v. Everson Evangelical Church,* 454 Pa. 434, 312 A.2d 35 (1973), *app. dismd.* 416 U.S. 923, 94 S.Ct. 1921, 40 L.Ed.2d 279 (1974):

> It has long been established in Pennsylvania that when a local church is a member of and subscribes to the doctrine and control of a hierarchially governed denomination, it cannot sever itself from such religious denomination without forfeiting its property to the parent denomination.

*Id.,* 454 Pa. at 437, 312 A.2d at 37. Although the cited language may, if viewed in a vacuum, support the Commonwealth Court decision, that language did not appear in a vacuum. To the contrary, the Court clearly indicated what was intended by that language by the following explanation:

> It is true that courts are proscribed from turning to an interpretation of ecclesiastical law in resolving title, and the right to possession of church property. In fact, *courts may not inquire into ecclesiastical questions.* (Citation omitted.) *However, courts are not proscribed from entertaining and resolving such disputes if such can be resolved by the application of "neutral principles of law."* (Emphasis supplied.)

*Id.,* 454 Pa. at 439, 312 A.2d at 38.

In *Everson* the parties seeking to secede from the parent organization admitted that the governing rules, by which they were bound, specifically provided "that the parent denomination governs all matters relating to the use of property held by its member churches." *Id.,* 454 Pa. at 438, 312 A.2d at 37. It was this admission which mandated the Court's ultimate affirmance of the award of property to the parent organization. It was definitely not, however, a blind deferral by this Court to the will of the parent group, as the Commonwealth Court's interpretation implied.

■ In the context of the present case we now hold that the Commonwealth Court should not have applied the broad

deference rule which it chose; and that in cases where the resolution of a property dispute involves no inquiry into ecclesiastical questions, courts of this Commonwealth are to apply the same principles of law as would be applied to non-religious associations.[5]

## II

Resolution of the underlying dispute here is not accomplished by the mere acceptance of the theory urged upon us by Middlesex. That theory now must be applied to the facts.[6] However, before proceeding further, it is important to emphasize that, as evidenced by the record, the present dispute is not based on a doctrinal schism. Neither party here is arguing that they are the true church in an ecclesiastical sense and the record is bare of the subject indication. Consequently, our decision should in no way be considered as a resolution of any competing doctrinal issues. What is involved here is a pristine question of property control, without the religious entanglements which prompted the *Watson* Court, and prior panels of this Court, to yield the gavel to the ecclesiastical hierarchies.

■ The standard of review for an appellate court in reviewing the findings of a court in equity is well established. Facts found by the chancellor, when supported by competent evidence in the record, are binding. However, no such deference is mandated for conclusions of law, and we are at liberty to review such conclusions. *Sechler v. Sechler*, 403 Pa. 1, 4, 169 A.2d 78, 80 (1961). *See Curtis v.*

5. We note that some lower courts in Pennsylvania have already applied this approach. *For example,* in *Vaughn v. Taylor,* No. 82–04260 (C.P. Allegheny, October 20, 1982), then Judge, now Justice Papadakos held that, so long as no ecclesiastical questions are involved, property disputes between competing church groups may be resolved by applying the property laws of Pennsylvania to the facts. Adjudication at p. 5. *See also Presbytery of Donegal of Calhoun,* No. 80–78 (C.P. Chester, April 14, 1984) (Bodley, J.).

6. In this vein we note that the Commonwealth Court, even had they accepted appellant's theory, would nevertheless have ruled against them; since in their view the facts supported a finding of a trust in favor of UPCUSA.

*Redevelopment Authority,* 482 Pa. 58, 393 A.2d 377 (1978); *Felmlee v. Lockett,* 466 Pa. 1, 351 A.2d 273 (1976).

In the context of the present case the chancellor's findings of facts were as follows:

1. The Middlesex Presbyterian Church has been affiliated with the United Presbyterian Church in the United States of America and its predecessors since the Church's inception in 1799.

2. Pursuant to a vote of 125–31 on April 6, 1981, the members of Middlesex duly amended its charter to disaffiliate from UPCUSA, effective April 18, 1981.

3. Pennsylvania statutory and case law treat religious denominations and their affiliates like any other voluntary organization; thus they have only such rights as are granted to them by the denomination's internal law.

4. The Constitution of UPCUSA consists of two parts: The Book of Confessions and The Book of Order which contains the Directory for Worship, the Form of Government, and the Book of Church Discipline. (Affidavit of Rev. J. Clyde Henry, D.D. at 4.)

5. The UPCUSA Constitution is the supreme law of the denomination. The statements of General Assemblies are not the law of the Church. Only when an amendment is adopted do resolutions, reports, etc., have the force and effect of law.

6. The history of the UPCUSA Book of Order reflects that in 1979, an amendment was proposed which would have created a trust in favor of UPCUSA with respect to property owned by affiliated churches. That amendment was not ratified and never became part of the UPCUSA constitution until May 23, 1981, after Middlesex voted to disaffiliate. (Affidavit of Rev. J. Clyde Henry, D.D. at 15; Exhibits C & D to Thorid Affidavit of defendant's in support of their motion for summary judgment.)

7. The Constitution does not prohibit a congregation from disaffiliating, and until May, 1981, did not create a trust, explicit or implicit, in affiliates' property in favor of UPCUSA.

8. The real estate in controversy consists of three parcels of ground in Middlesex Township, Butler County as follows:

(a) Ejectment proceedings at No. 4, January Term, 1926, Book 4, Page 149 in case of *Kerns v. Trustees of the Middlesex Congregation,* by jury verdict of October 3, 1825, established title to the original five acre tract.

(b) Deed from Thomas L. Lyon, et. al, to Middlesex Presbyterian Church covering 2½ acres dated May 12, 1948, Deed Book 572, Page 482, and a correction deed recorded in Deed Book 794, Page 386, said parcel to be known as the "Lyon Memorial Park" and to be used for such church purposes as the congregation sees fit, recorded August 21, 1963.

(c) Deed dated September 19, 1948, from Stephen G. Hamilton et al., to Middlesex Presbyterian Church covering five acres recorded in Deed book 582, Page 541.

9. Record title to all of the real and personal property in dispute in this case has been exclusively in Middlesex at all relevant times. There is no evidence that Middlesex ever explicitly agreed to hold its property in trust for UPCUSA.

█ Though the Commonwealth Court found no error with these findings, they disagreed with the trial court's ultimate conclusion of law, i.e., that no trust existed in favor of the central denomination. The Commonwealth Court's conclusion was that the record revealed an intent to create a trust. On our review of the record we find no support for this latter determination, and we reinstate the decision of the trial court.

█ In order for a court to find that a trust has been created there must exist in the record clear and unambiguous language or conduct evidencing the intent to create the trust. This Court has previously held:

No particular form of words or conduct is required to manifest the intention to create a trust. Such manifestation of intention may be written or spoken words or

conduct indicating that settlor intended to create a trust. (Citations omitted.) *Nevertheless, lack of formality does not obviate the necessity for the appearance of all the elements of a completed trust. Every trust symptom must be present, regardless of informality surrounding the inception of the relationship, or none exists. A trust must be created by clear and unambiguous language or conduct, it cannot arise from loose statements admitting possible inferences consistent with other relationships.* (Emphasis added.)

*Bair v. Snyder County State Bank,* 314 Pa. 85, 89, 171 A. 274, 275 (1934).

■ In conducting this inquiry the primary focus must be on the intent of the settlor at the time of the creation of the alleged trust. *See* § 45 Bogert, *Trusts and Trustees,* p. 457 (2nd ed. 1984); Restatement, Second, Trusts § 23. The putative settlor in this case was clearly Middlesex. In support of this conclusion we note that the Middlesex church was not a creation or offshoot of the central denomination. Rather, the record establishes that the Middlesex church was created and incorporated on the local level by members of the parish; and that all property was retained in the corporate name of the local church. Subsequently, when the local body voluntarily affiliated with UPCUSA's predecessor, there was no express trust language in the denomination's constitution. Also, it was undisputed that there was never any express trust language in the constitution during the entire period Middlesex remained affiliated with the denomination. In fact, a prior attempt by the predecessor denomination, circa 1929, to include express trust language in the constitution was defeated by the member churches.

The denomination here has cited no evidence that Middlesex ever intended to convey their property interests to them. To the contrary, throughout their entire affiliation Middlesex retained all property in their own corporate name. The Commonwealth Court's reliance on selected passages from the Book of Order was misplaced in that the

court ignored the overall intent of that book as a means of overseeing the *spiritual* development of member churches. In addition, these selected provisions, which at most evidence the putative trustee's desired interpretation, are far from constituting the clear unequivocal evidence necessary to support a conclusion that a trust existed.

Accordingly, the order of the Commonwealth Court is reversed and the final decree of the Court of Common Pleas of Butler County is reinstated.