**Joseph G. GASTON and Susan C. Gaston and Joseph G. Gaston and Susan C. Gaston as Guardians for their minor children Lisa M. Gaston and Ryan J. Gaston, Appellants,**

v.

**DIOCESE OF ALLENTOWN, Diocese of Allentown Department of Education and Kathlene Kelly–Brockel.**

Superior Court of Pennsylvania.

Submitted Feb. 3, 1998.

Filed April 20, 1998.

Joseph T. Heber, Allentown, for appellants.

Joseph F. Leeson, Jr., Bethlehem, for appellees.

Before POPOVICH and JOYCE, JJ., and CIRILLO, President Judge Emeritus.

CIRILLO, President Judge Emeritus.

This is an appeal from an order of the Court of Common Pleas of Lehigh County granting the defendants' preliminary objections in the nature of a demurrer. We affirm.

Appellants, Joseph Gaston and Susan Gaston, individually and as guardians for Lisa Gaston and Ryan Gaston, their minor children, filed a complaint against appellees/defendants, The Diocese of Allentown, The Diocese of Allentown Department of Education, and Kathleen Kelly–Brockel. The complaint alleged negligent and intentional infliction of emotional distress and sought compensatory and punitive damages. The minor children were both students at Christ the King School, a private parochial elementary school operated by the Roman Catholic Diocese of Allentown and the Diocese's Department of Education. The Gastons filed their complaint after the minor children were expelled from the school due to "discipline problems." At the time of the expulsions, Kathleen Kelly–Brockel was the Principal of Christ the King School.

In their complaint, the Gastons alleged that their minor children were expelled "without cause." The Gastons contended that the expulsion was not due to the alleged "discipline problems," but, instead was due to the fact that the Gastons had voiced their objection to the approved curriculum, in particular a course entitled "Creative Conflicts." The Gastons' son, a fifth grade student, was required to participate in the course. The Gastons criticized the course because the students were instructed not to discuss the con-

tent of the course outside of the classroom or with their parents and were not permitted to remove the course textbook or workbook from the classroom.

On February 7, 1992, the Gastons sent a letter to Kathleen Kelly–Brockel in which they voiced their concern. On or about March 4, 1992, Ms. Kelly–Brockel reported to Whitehall Police that Joseph Gaston had made threats against her and that the Gaston children had become discipline problems. That same day, Ms. Kelly–Brockel informed the Gastons that Ryan and Lisa had been expelled from the school. The Gastons averred that at that time the only reason expressed for the expulsion was "because of Mr. Gaston."

On May 17, 1992, a hearing was held before the Diocese of Allentown Department of Education. The Department of Education ratified the expulsion. On April 5, 1993, in a letter to the Gastons, His Excellency, Thomas J. Welsh, the Bishop of the Diocese of Allentown, ratified Ms. Kelly–Brockel's decision to expel the Gaston children.

The Gastons further averred in their complaint that the Diocese of Allentown expelled the children with the intention of causing the Gastons extreme emotional distress. The Gastons also claimed that as a result of both the intentional and negligent infliction of emotional distress, the Gastons have suffered humiliation and embarrassment, as well as physical harm including loss of appetite, inability to sleep, elevated blood pressure, migraine headaches, dietary disturbance, and heightened sensitivity and irritability. Additionally, the Gastons averred that the children suffered emotional distress. The Gastons sought compensatory as well as punitive damages.

Defendants/appellees filed preliminary objections pursuant to Pennsylvania Rule of Civil Procedure 1028, seeking dismissal for failure to state a cause of action in either negligent or intentional infliction of emotional distress, or, in the alternative, for failure to exhaust administrative remedies or failure to obtain jurisdiction. The trial court sustained the objections and dismissed the complaint. The trial court grounded its decision on jurisdictional grounds, stating that the action was

an attempt to involve the civil courts in ecclesiastic rule, custom or law, as upheld and affirmed by a bishop of the Roman Catholic Church. The trial court relied on the case of *Presbytery of Beaver–Butler of the United Presbyterian Church in the United States v. Middlesex Presbyterian Church*, 507 Pa. 255, 489 A.2d 1317, *cert. denied*, 474 U.S. 887, 106 S.Ct. 198, 88 L.Ed.2d 167 (1985).

The Gastons filed this appeal. They raise one issue: Did the Court of Common Pleas of Lehigh County have jurisdiction over the subject matter of plaintiffs' suit sounding in negligence even though one of the parties was a religious institution, to wit, the Diocese of Allentown, a subdivision of the Roman Catholic Church?

When reviewing a decision granting preliminary objections in the nature of a demurrer, any doubt should be resolved in favor of overruling the demurrer. *Scarpitti v. Weborg*, 530 Pa. 366, 609 A.2d 147 (1992); *Clifton v. Suburban Cable TV, Inc.*, 434 Pa.Super. 139, 143, 642 A.2d 512, 514 (1994). Preliminary objections should be sustained only in cases that are clear and free from doubt. *See Ambrose v. Cross Creek Condominiums*, 412 Pa.Super. 1, 602 A.2d 864 (1992). The trial court must consider as true all well pleaded facts set forth in the complaint and all reasonable inferences drawn therefrom. *Bower v. Bower*, 531 Pa. 54, 611 A.2d 181 (1992). If the facts pleaded state a claim for which relief may be granted under any theory of law, then there is sufficient doubt to require rejection of the demurrer. *See McClellan v. Health Maintenance Organization of Pennsylvania*, 413 Pa. Super. 128, 604 A.2d 1053 (1992).

In *Presbytery of Beaver–Butler, supra*, the Pennsylvania Supreme Court was faced with the issue of whether to exercise jurisdiction in a dispute over church property. Middlesex Presbyterian Church (Middlesex), a local church and a member of a nationwide religious denomination, represented by the Beaver–Butler Presbytery of the United Presbyterian Church (Presbytery), disaffiliated in April of 1981. Since its inception in 1907, Middlesex had been a participating church in the national organization. The Middlesex

decision to disaffiliate precipitated the church property dispute. The issue before the Pennsylvania Supreme Court questioned whether the local church could retain ownership of the assets and property after having terminated its denominational membership. *Presbytery,* 507 Pa. at 255, 489 A.2d at 1318.

Presbytery initiated the action by filing a complaint in equity seeking an accounting of church property and an injunction prohibiting the dissipation of church assets. Middlesex filed preliminary objections. Thereafter, Presbytery filed a second complaint in equity seeking to secure the right of those members who did not vote to secede to utilize the church property for worship while the litigation proceeded. The court of common pleas issued a special injunction enjoining Middlesex from using church property in any manner inconsistent with Presbytery's dictates. Following a hearing, the injunction was dissolved. In its answer to the complaint in the original matter, Middlesex responded that it never agreed to surrender title to its property to the national organization. Both parties moved for summary judgment. The trial court granted summary judgment in favor of Middlesex, finding no original agreement of trust placing the local church property in the control or ownership of the national church. These findings were affirmed by the trial court en banc, and a final decree was entered. 507 Pa. at 259–259, 489 A.2d at 1319. On appeal to the Commonwealth Court, the decision was reversed. *See Presbytery of Beaver–Butler of the United Presbyterian Church in the United States of America v. Middlesex Presbyterian Church,* 80 Pa. Commw. 211, 471 A.2d 1271 (1984).

Concluding that the Commonwealth Court had improperly relied upon the "deference" rule, as opposed to the "neutral principles of law" rule, the Supreme Court of Pennsylvania reversed. The Pennsylvania Supreme Court found no religious entanglement to cause it to yield to ecclesiastical rule and concluded that the question simply presented a "pristine question of property control[.]" *Presbytery,* 507 Pa. at 266, 489 A.2d at 1323. The Supreme Court of Pennsylvania reviewed the findings of the equity court, and

reinstated the final decree. *Id.* at 270, 489 A.2d at 1325.

In *Watson v. Jones,* 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1871), the Supreme Court set forth the "deference rule," the wisdom of which was reaffirmed by our state supreme court in *Presbytery of Beaver–Butler, supra.* The "deference rule," as the *Watson* ruling is known, states:

> [W] henever the question of discipline, or of faith, or ecclesiastical rule, custom, or law [has] been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them in their application to the case before them.

*Watson,* 80 U.S. at 727. In *Presbytery of Beaver–Butler, supra,* our state supreme court reiterated the wisdom of the "deference rule:"

> [T] he right to practice one's belief and worship as one chooses is so deep a root of our constitutional culture that a court, even one with the best intentions, can be no more than a clumsy intruder into the most delicate and sensitive areas of human life. When Caesar enters the Temple to decide what the Temple believes, he can leave behind only his own views. The view of a court as to who are heretics among warring sects is worth nothing, and must count as nothing if our cherished diversity of religious views is to prevail.

*Presbytery,* 507 Pa. at 260, 489 A.2d at 1320.

In *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America,* 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952), the Supreme Court reaffirmed the rule that a doctrinal dispute was best resolved by church authorities. The Court, quoting *Watson,* stated:

> In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe [upon] personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious

associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. **But it would be a vain consent and would lead to the total subversion of such religious bodies, if anyone aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.**

*Id.* at 114–15, 73 S.Ct. at 153–54 (emphasis added).

In *Presbytery*, however, our supreme court recognized, as did the Supreme Court of the United States in *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969), that not all disputes among congregation members are doctrinal; some disputes involve only questions of civil law that can be solved without "intruding into the sacred precincts." *Presbytery*, 507 Pa. at 262, 489 A.2d at 1321. From this evolved the "neutral principles approach," explained as follows:

It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which

can be applied without "establishing" churches to which property is awarded. *Presbyterian Church,* 393 U.S. at 449, 89 S.Ct. at 606.

In *Presbytery,* our supreme court adopted and applied the "neutral principles approach," concluding that the issue before the court required no doctrinal explication. The court held that "in cases where the resolution of a property dispute involves no inquiry into ecclesiastical questions, courts of this Commonwealth are to apply the same principles of law as would be applied to non–religious associations." 507 Pa. at 266, 489 A.2d at 1323.[1]

The question here, however, is not a property or contractual dispute. It is a claim that hints at tort law, but is based on an expulsion decision ratified by a bishop; it is, in our opinion, not receptive to application of neutral principles of law. The Catholic school's disciplinary code and review of expulsion involve matters of church doctrine. *Compare Bear v. Reformed Mennonite Church, et al.,* 462 Pa. 330, 334, 341 A.2d 105, 107 (1975) (court reversed order granting preliminary objections in case involving "shunning," the practice of avoiding, socially and in business, one member of the church by all other members as part of the process of excommunication; court determined that the practice of shunning may excessively interfere with maintenance of the marriage and family relationships and business relationships, areas the court might have authority to regulate) *with Kedroff, supra* (doctrinal dispute belongs to church authorities). Absent allegations of acts against the public welfare or acts of immorality, or allegations of "excessive interference within areas of paramount state concern, i.e. the maintenance of marriage and family relationship, alienation of affection, and the tortious interference with a business relationship, which the courts of this Commonwealth may have authority to regulate, even in light of the 'Establishment' and 'Free Exercise' clauses of the First Amend-

---

1. For an in depth discussion the courts and canon law, see Note, The Courts and Canon Law, 6 Cornell J.L. & Pub. Pol'y 171 (1996); Ellenby, *Divinity vs. Discrimination: Curtailing the Divine Reach of Church Authority,* 26 Golden Gate U.L.Rev. 369 (1996); Gerstenblith, *Civil Court Resolution of Property Disputes Among Religious Organizations,* 39 Am.U.L.Rev. 513 (1990); Sirico, *Church Property Disputes: Churches as Secular and Alien Institutions,* 55 Fordham L.Rev. 335 (1986); Note, Judicial Resolution of Intrachurch Disputes, 83 Colum.L.Rev. 2007 (1983).

ment[,]" this court is loath to interfere with a bishop's decision on student expulsion. *Bear, supra.*

The parochial school, synonymous with the installation of dogma and discipline in its students, is an integral part of the Roman Catholic Church. The school is a repository for Catholic tradition and scripture; it is so intertwined with the church doctrine that separation is neither pragmatic nor possible. Intrusion into the bishop's decision on matters concerning parochial school discipline and expulsion places this court perilously close to trespassing on sacred ground.

Order affirmed.