Kimberly **CONNOR** and Larry Connor, in their Own Right and as the Parents and Guardians of Eric Connor, a Minor, Appellants

v.

**ARCHDIOCESE OF PHILADELPHIA,** St. Eleanor's School, Reverend Patrick Sweeney, Pastor and Sister Mary Marie Heenan, RNS, Appellees.

Superior Court of Pennsylvania.

Argued Jan. 9, 2007.

Filed Aug. 16, 2007.

Reargument Denied Oct. 19, 2007.

---

Alan S. Gold, Jenkintown, for appellants.

Thomas W. Dymek, Philadelphia, for Archdiocese, appellee.

BEFORE: STEVENS, McCAFFERY, and KELLY, JJ.

OPINION BY McCAFFERY, J.:

¶ 1 Appellants, Kimberly Connor and Larry Connor, in their own right and as parents and guardians of Eric Connor, a minor, appeal from the order that dismissed their complaint and sustained the preliminary objections of Appellees, the Archdiocese of Philadelphia; St. Eleanor's School; the Reverend Patrick Sweeney, Pastor; and Sister Mary Marie Heenan, RNS. Specifically, Appellants argue that the trial court erred by dismissing their complaint on the basis of the "deference rule," a constitutional principle that prohibits the courts from reviewing matters of ecclesiastical discipline implemented by a religious organization. After careful review, we affirm.

¶ 2 The relevant factual history of this matter, as gleaned from the allegations set forth in Appellants' complaint, is as follows. In March 2004, Eric Connor was a seventh grade student at St. Eleanor's School, a Catholic elementary school located in Collegeville, Pennsylvania. After having read an assigned book portraying gang violence, the seventh grade boys developed "a significant interest in knives and weapons," and several of the boys began bringing knives to the school. (Complaint, filed April 7, 2005, at ¶ 19). Accompanying the boys' newfound interest in gang violence and knives was an already existing animosity dividing the seventh and sixth grade boys, which animosity had previously caused regular physical and verbal altercations among the boys in these two grades.

¶ 3 On March 9, 2004, Eric was involved in a shoving match with a sixth grade boy at the school, which event resulted in the scheduling by the seventh and sixth grade boys of a more serious fight (a "rumble") for the next day. (Id. at ¶ 21). Some of the seventh grade boys were concerned that the sixth graders would bring weapons to the arranged fight. Eric stated to a classmate that he would bring to the fray a miniature "thing" that was meant to be a "bluff." (Id. at ¶ 24).

¶ 4 On March 11, 2004,[1] Sister Mary Marie Heenan ("Sister Marie"), the princi-

---

1. Although Appellants' complaint alleged that     the fight was to take place on March 10, 2004,

pal of St. Eleanor's School, was contacted by numerous parents expressing concern about information they had received indicating that students were bringing knives to the school. Also that day, a seventh grade student spoke to the pastor of the parish, Father Patrick Sweeney, concerning information about the fight that had been scheduled. Following this student's conversation with Father Sweeney, Eric was called to Sister Marie's office. Upon his arrival, Eric was placed alone in a room for an undisclosed period of time but was not questioned by any school or parish personnel. Sister Marie eventually entered the room and asked Eric to turn over to her a penknife that he was believed to possess. Eric replied that he did not have a knife, but did place on a desk an item described in the complaint as a "two inch nail file along with scissors and a letter opener." (*Id.* at ¶ 33; Trial Court Opinion, dated July 26, 2006, at 3). The complaint failed to allege the size or dimensions of the letter opener or scissors.[2]

¶ 5 After the encounter in her office, Sister Marie telephoned Eric's mother, Kimberly Connor, and informed her that her son had been seen on the school bus with a penknife, the possession of which was a serious violation of school policy. Eric was immediately expelled from the school without a prior hearing, nor was there a subsequent hearing.

¶ 6 On March 12, 2004, Father Sweeney sent a letter to Kimberly and Larry Connor, officially notifying them of Eric's expulsion from the school. The letter stated in its entirety:

As of March 11, 2004[,] your son, Eric, is dismissed from Saint Eleanor School. On Thursday, March 11, 2004[,] Eric brought a pen knife to school. As stated in our Parent/Student Handbook[:] "Certain serious violations of our discipline code warrant automatic suspension and/or dismissal." I deem this situation a very serious violation of our discipline code and therefore I am informing you of Eric's expulsion.

(Letter from Father Sweeney to Kimberly and Larry Connor, dated March 12, 2004, Complaint Exhibit "A"). On March 17, 2004, a letter signed by Father Sweeney, Sister Marie, and two other parish and/or school personnel, was sent to the parents and guardians of the students of the school. Among other matters, the letter stated that a student had been expelled for bringing a penknife to school. The letter further discussed what school personnel had done in an attempt to defuse tensions at the school, and further advised parents and guardians how they could help at home. Eric was not mentioned by name in the letter, but the letter stated that Father Sweeney had seen and confirmed the existence of the penknife.

¶ 7 Appellants commenced the present action against Appellees alleging breach of contract, violation of the Constitution of the Commonwealth of Pennsylvania (specifically, a violation of due process rights), defamation, negligent infliction of emotional distress, and intentional infliction of emotional distress. At the core of Appellants' complaint were allegations that Eric had ***not*** brought a penknife to school; that he had brought a small personal manicure set to school while other students, who had

---

the complaint failed to allege any facts as to what had occurred that day, aside from discussions among the seventh grade boys concerning an *upcoming* fight to take place the following day, March 11, 2004.

2. Kimberly Connor also described the item as resembling a miniature Swiss Army knife, but not a penknife. (Letter from Kimberly Connor to Father Sweeney, dated March 15, 2004, Complaint Exhibit "B").

not been disciplined, brought switchblades and other such weapons to school; that Father Sweeney and Sister Marie had failed to investigate whether Eric had actually brought a knife to school prior to expelling Eric; and that subsequent statements made by Father Sweeney and Sister Marie concerning allegations that Eric had brought a penknife to school were false and injurious.

█ ¶ 8 Appellees filed preliminary objections to the complaint, alleging a lack of subject matter jurisdiction and failure to state claims upon which relief may be granted. Following oral argument, the trial court granted Appellees' preliminary objections and dismissed Appellants' complaint with prejudice. Specifically, the court determined that because Appellants' complaint challenged actions taken by a religious organization and its members or employees regarding internal matters of discipline, rule, or custom, the court lacked subject matter jurisdiction pursuant to the "deference rule," in accordance with this Court's decision in *Gaston v. Diocese of Allentown*, 712 A.2d 757 (Pa.Super.1998).[3] The deference rule, prohibiting court review of questions of ecclesiastical discipline, faith, rule, custom, or law, is, in turn, based upon freedom of religion principles set forth in the "Establishment" and "Free Exercise" Clauses of the First Amendment of the United States Constitution. *Presbytery of Beaver–Butler of the United Presbyterian Church in the United States v. Middlesex Presbyterian Church*, 507 Pa. 255, 259–60, 489 A.2d 1317, 1319–20 (1985).

¶ 9 Appellants filed a timely notice of appeal in which they raise the following three issues for our review:

1. Does the First Amendment of the United States Constitution bar a complaint for defamation brought by a twelve year old boy based on a priest and a nun uttering knowingly false statements that he brought a weapon to the religious school they operated?

2. Does the First Amendment of the United States Constitution bar a complaint by a twelve year old boy for negligent infliction of emotional distress based on statements of a priest and a nun that he had brought a weapon to the religious school that they operated?

3. Does the First Amendment of the United States Constitution bar a complaint by a twelve year old boy against a priest and a nun and the religious organizations that employ them when the boy contends that as a result of statements that they falsely made indicating that he had a brought a weapon or a penknife to a religious school that he had been shunned from a variety of community activities and from participation in the social life of his community?

(Appellants' Corrected Brief at 4).

¶ 10 Our review of Appellant's issues is informed by the following principles:

Our standard of review mandates that on an appeal from an order sustaining preliminary objections which would result in the dismissal of suit, we accept as true all well-pleaded material facts set forth in the [a]ppellant's complaint and all reasonable inferences which may be drawn from those facts. This standard is equally applicable to our review of [preliminary objections] in the nature of a demurrer. Where, as here, upholding sustained preliminary objections would result in the dismissal of an action, we may do so only in cases that are clear and free from doubt. To be clear and

---

**3.** A thorough discussion of *Gaston* is set forth *infra*.

free from doubt that dismissal is appropriate, it must appear with certainty that the law would not permit recovery by the plaintiff upon the facts averred. Any doubt should be resolved by a refusal to sustain the objections.

We review for merit and correctness—that is to say, for an abuse of discretion or an error of law. [When a] case [is] dismissed at the preliminary objections stage on issues of law[,] our scope of review is [ ] plenary.

*Reardon v. Allegheny College,* 926 A.2d 477, 480 (Pa.Super.2007) (quoting *Donahue v. Federal Express Corp.,* 753 A.2d 238, 241 (Pa.Super.2000)).

¶ 11 While apparently conceding the fatal applicability of the "deference rule" to some claims in their complaint,[4] Appellants argue that the trial court erred by applying the deference rule to their two counts in defamation and their single count in negligent infliction of emotional distress (collectively, the "non-abandoned claims") because judicial review of these causes of action would not require the court to inquire into matters of a religious doctrinal nature. Appellants' first defamation count alleges that on nine specific dates in March 2004, Father Sweeney and Sister Marie made statements to various unnamed students and parents of students who were attending St. Eleanor's School; that these statements indicated that Eric had been expelled for bringing a penknife to school and posing a danger to the other students; that Father Sweeney and Sister Marie should have known that Eric did not possess a penknife or pose a danger to anyone; and that Appellants had been injured by the defamatory statements made by Father Sweeney and Sister Marie. Appellants' second count in defamation, incorpo-

rating the allegations made in the previous counts, alleges that Appellants have suffered humiliation and emotional distress as a result of treatment they have received from some members of the community based on Eric's expulsion from the school. Appellants' count in negligent infliction of emotional distress alleges that Father Sweeney and Sister Marie negligently inflicted emotional distress upon Eric by expelling him from school without cause; by sending letters to every parent having a child or children in the parish school "stating that Eric had been expelled for having a weapon;" and by making comments to unspecified "members of the community" that Eric had been expelled for bringing a weapon to school, when the allegations that Eric had brought a weapon to school were false. (Complaint at ¶ 85).

¶ 12 The constitutional, legal, and historical underpinnings of the deference rule were well and thoroughly described by, among others, our Supreme Court in *Presbytery of Beaver–Butler, supra* at 259–61, 489 A.2d at 1319–20, and this Court in *Gaston, supra* at 758–60. Therefore, because there is no reason to restate the commendable work set forth in those opinions, we simply take note that the deference rule has been articulated, in part, as follows:

Whenever the question of discipline, or of faith, or ecclesiastical rule, custom, or law has been decided by the highest of [ ] church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them in their application to the case before them.

*Gaston, supra* at 759 (quoting *Watson v. Jones,* 13 Wall. 679, 80 U.S. 679, 727, 20 L.Ed. 666 (1872)). Further,

---

4. In light of the limited nature of the issues raised in the case *sub judice,* it is apparent that Appellants have abandoned their causes of action for breach of contract, failure to provide due process, and intentional infliction of emotional distress.

[i]n this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe upon personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. *All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if anyone aggrieved by one of their decisions could appeal to the secular courts and have them reversed.* It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.

*Id.* at 759–60 (quoting *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in North America*, 344 U.S. 94, 114–15, 73 S.Ct. 143, 97 L.Ed. 120 (1952)) (emphases added, deleted, and in the original). Thus, the deference rule generally prohibits a civil court from reviewing decisions made by religious organizations regarding matters involving internal rules, customs, or practices affecting the members of those religious organizations.

¶ 13 However, our courts have also recognized that not all disputes involving religious organizations or their members are doctrinal or ecclesiastical in nature, as some disputes will involve issues purely of civil law that do not improperly stray into "the sacred precincts." *Presbytery of Beaver–Butler, supra* at 262, 489 A.2d at 1321. Issues involving property disputes between, among, or including religious organizations or congregation members have been determined by the United States and Pennsylvania Supreme Courts to be matters that may fall comfortably within the jurisdiction of our civil courts. "[I]n cases where the resolution of a property dispute involves no inquiry into ecclesiastical questions, courts of this Commonwealth are to apply the same principles of law as would be applied to non-religious associations." *Id.* at 266, 489 A.2d at 1323; *see also Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969).

¶ 14 In Pennsylvania, civil courts are permitted to decide non-ecclesiastical issues in litigation involving religious organizations or interests pursuant to the "neutral principles of law approach." *In re Church of St. James the Less*, 585 Pa. 428, 445, 888 A.2d 795, 805–06 (2005). Appellants argue that in the case *sub judice*, the neutral principles of law approach should have been applied by the trial court to preserve Appellants' counts in defamation and negligent infliction of emotional distress. However, in making this argument, Appellants attempt to too-finely dissect their non-abandoned claims from the essence of their grievance, which is a challenge to an internal disciplinary decision of a religious organization. More importantly, Appellants fail to grasp fully the controlling effect of *Gaston, supra*.

¶ 15 In *Gaston*, parents of children expelled from a parochial school sued, in their own right and as guardians of their children, the Diocese of Allentown; the Diocese Department of Education, which affirmed the expulsion decision; and the principal of the school. The complaint alleged counts in negligence and intentional infliction of emotional distress and sought compensatory and punitive damages. The trial court sustained the preliminary objections of the defendants and dismissed the complaint in its entirety on the basis that the action was an attempt to involve the civil courts in ecclesiastical rule, custom, or law, as ultimately upheld by a bishop of the religious organization.

¶ 16 On appeal, the appellants argued that the trial court erred by dismissing their action because it sounded in negligence and thus was a matter that could be decided by the courts under the neutral principles of law approach. This Court rejected that argument, noting that the neutral principles of law approach did not arise from cases where allegations of tortious conduct connected to ecclesiastical decisions had been made. We stated in relevant part:

> The question here [ ] is not a property or contractual dispute. It is a claim that hints at tort law, but is based on an expulsion decision ratified by a bishop; it is, in our opinion, not receptive to application of neutral principles of law. The Catholic school's disciplinary code and review of expulsion involve matters of church doctrine. *Compare Bear v. Reformed Mennonite Church, et al.,* 462 Pa. 330, 334, 341 A.2d 105, 107 (1975) (court reversed order granting preliminary objections in case involving "shunning," the practice of avoiding, socially and in business, one member of the church by all other members as part of the process of excommunication; court determined that the practice of shunning

may excessively interfere with maintenance of the marriage and family relationships and business relationships, areas the court might have authority to regulate) *with Kedroff, supra* (doctrinal dispute belongs to church authorities). Absent allegations of acts against the public welfare or acts of immorality, or allegations of "excessive interference within areas of paramount state concern, i.e. the maintenance of marriage and family relationship, alienation of affection, and the tortious interference with a business relationship, which the courts of this Commonwealth *may* have authority to regulate, even in light of the 'Establishment' and 'Free Exercise' clauses of the First Amendment," this court is loath to interfere with a bishop's decision on student expulsion. *Bear, supra.*

> The parochial school, synonymous with the inst[i]llation of dogma and discipline in its students, is an integral part of the Roman Catholic Church. The school is a repository for Catholic tradition and scripture; it is so intertwined with the church doctrine that separation is neither pragmatic nor possible. Intrusion into the bishop's decision on matters concerning parochial school discipline and expulsion places this court perilously close to trespassing on sacred ground.

*Gaston, supra* at 760–61.

¶ 17 It is clear from *Gaston* that it is not within the purview of the courts of this Commonwealth, under the guise of a tort action, to review a decision to expel a student from a parochial school. Appellants' arguments that their defamation and negligent infliction of emotional distress claims are somehow separate and apart from the decision to expel Eric are wholly unpersuasive. First, the negligent infliction of emotional distress claim is based directly upon Appellees' decision to expel

Eric "without cause." (Complaint at ¶ 85). Clearly, under the deference rule, we may not review the question of whether a student was appropriately expelled from or otherwise disciplined by a school operated solely by a religious organization. Moreover, *Gaston* determined that an action in *intentional* infliction of emotional distress made against a religious organization, based directly upon the expulsion of children from a parochial school, may not be reviewed by the courts pursuant to the deference rule. There is no discernable reason why the same disposition should not apply to an action made against a religious organization based upon the expulsion of a parochial school student grounded in *negligent* infliction of emotional distress.

¶ 18 Second, Appellants' defamation and negligent infliction of emotional distress claims all allege injury as a result of information disseminated *wholly within the parish community*[5] by Father Sweeney and Sister Marie concerning the fact that Eric or an unnamed student had been expelled for bringing a weapon to the parish school.[6] However, a decision by a religious organization to discuss the fact and import of an ecclesiastical disciplinary decision is, for purposes of the deference rule, no different than the imposition of the discipline itself. This

Court would indeed be straying into "the sacred precincts" (*Presbytery of Beaver– Butler, supra* at 262, 489 A.2d at 1321) if it determined that a religious organization would be subject to civil liability for communicating to its community the existence of a disciplinary decision made and imposed by the organization. If our civil courts may not review an action that challenges the legitimacy of a disciplinary decision of a parochial school, then, in like fashion, they may not review an action that challenges the dissemination of information regarding that decision, at the very least within the narrowly circumscribed limits of the parish community.[7]

¶ 19 Appellants argue that court decisions from other jurisdictions support their argument that the courts of this Commonwealth may review their non-abandoned claims. We cannot agree. First, we conclude that because the decisions of our Supreme Court and this Court provide sufficient guidance under the facts alleged in this case, there is no need to resort to the opinions from other jurisdictions. Second, the cases cited by Appellants are distinguishable from the facts of the case *sub judice;* in fact, they are supportive of our decision herein. In order to afford Appellants a thorough review of their arguments, we briefly note the holdings of

5. Appellants also alleged that an unnamed employee of unspecified rank of the *public* school that Eric now attends became concerned upon receiving knowledge that the unnamed student who had been expelled from St. Eleanor's School might be attending the public school. However, Appellants do not allege that they suffered any adverse consequences as a result of this fact.

6. Although Appellant's negligent infliction of emotional distress claim alleged that Father Sweeney and Sister Marie mailed letters to the parents that named Eric as the student who had been expelled for bringing a weapon to school, Appellants' own evidence establishes that the letter mailed by Father Swee-

ney and Sister Marie *did not* mention Eric by name. (*See* Complaint, Exhibit "C").

7. *See also Rankin v. Phillippe,* 206 Pa.Super. 27, 211 A.2d 56 (1965) (holding that the trial court properly nonsuited a defamation action brought by one church member against church officials because, as the alleged defamatory statements made by those officials were contained in a letter sent solely to the 400 members of the church community, the statements were conditionally privileged; however, the Court did not review whether civil court jurisdiction was barred pursuant to the deference rule).

these cases and why they do not support Appellants' position.

¶ 20 In *Bowie v. Murphy*, 271 Va. 127, 624 S.E.2d 74 (2006), the Virginia Supreme Court determined that a church deacon could proceed in civil court, without running afoul of the deference rule, in a defamation action brought against a minister and several congregation members who were supporters of the minister in an internecine church dispute. However, the nature of the defamation claim was that the plaintiff, a male, had been falsely accused by the defendants of *physically assaulting* one of their number, a female. There is a clear distinction between a defamation action based on false accusations of assault and one based upon the dissemination of information regarding an ecclesiastical disciplinary matter.

¶ 21 In *Ausley v. Shaw*, 193 S.W.3d 892 (Tenn.Ct.App.2005), *appeal denied*, (Tenn., April 24, 2006), the Tennessee Court of Appeals held that in a defamation action brought by a terminated pastor against members of his former congregation, the court must first determine whether it had jurisdiction by investigating whether the alleged slanderous or libelous comments had been made during the case of an ecclesiastical undertaking, such as the discipline or removal of the pastor. If so, then the alleged wrongdoing would be considered of an ecclesiastical nature beyond the jurisdiction of the civil courts. If not, then the

civil courts would have jurisdiction to decide the dispute.[8] In the case *sub judice*, the alleged defamatory comments made by Father Sweeney and Sister Marie were distinctly made in the course of an ecclesiastical disciplinary matter and thus may not be reviewed by this Court pursuant to the deference rule.

¶ 22 In *Guinn v. Church of Christ of Collinsville*, 775 P.2d 766 (Okla.1989), the Supreme Court of Oklahoma determined that invasion of privacy and intentional infliction of emotional distress claims against church elders were not barred by the Free Exercise Clause of the First Amendment of the United States Constitution when those defendants continued to publicly denounce the plaintiff as a "fornicator" *after the plaintiff had terminated her membership in the church.* However, the Court also held that the actions taken by the church elders to discipline the plaintiff prior to her withdrawal of membership in the church were shielded from judicial scrutiny. In the case *sub judice*, Appellants have not alleged that they were denounced by Appellees after terminating their membership within the Catholic Church; rather, Appellants alleged only that Appellees had disseminated in the parish school community, during a limited period of time immediately following the incident, information regarding a disciplinary decision that involved Eric.[9] Thus, the

---

8. In *Ausley*, the court determined that since remarks made against the pastor were uttered after his termination of employment from the congregation and were made not only to members of the religious community but to the community at large, including law enforcement personnel, an action in defamation could be pursued in the civil courts.

9. *See also Calvary Christian School, Inc. v. Huffstuttler*, 367 Ark. 117, — S.W.3d — (2006), wherein the Supreme Court of Arkansas upheld an award for damages on a defamation claim brought by parents of a child

expelled from a parochial school, which award was based on evidence that a school principal had (1) called the child a liar when he reported, truthfully, that he had located a video camera hidden in a wall and directed into a classroom where students changed clothes; and (2) told individuals that the child had later given her "the finger" at a school football game. Without explicitly stating, the Court apparently concluded that the defamation claim was one that did not relate directly to religious doctrine or beliefs and therefore could be reviewed in civil court. However, in

foreign-jurisdiction cases relied upon by Appellants in support of their argument that the trial court's decision should be reversed are not persuasive.

¶ 23 Finally, Appellants argue that they have, appropriately for civil court review, "set forth a cause of action based on [Eric's] virtual shunning from the community because of false statements uttered by Reverend [ ] Sweeney and Sister [ ] Marie." (Appellants' Corrected Brief at 35). Appellants base this argument on the holding in *Bear, supra,* 462 Pa. 330, 341 A.2d 105 (1975), where our Supreme Court recognized that the deference rule did not prohibit a plaintiff from filing an equity action against a church and its bishops that alleged damages as a result of the church's directing its members to "shun" the plaintiff, that is, to have absolutely no business or social dealings with him. The church's directive prohibited, *inter alia,* the plaintiff's wife and children from having any social and physical contact with the plaintiff. Our Supreme Court determined that the allegations set forth in the plaintiff's complaint touched upon "excessive interference within areas of 'paramount state concern,' *i.e.[,]* the maintenance of marriage and family relationships, alienation of affection, and the tortious interference with a business relationship, which the courts of this Commonwealth *may* have authority to regulate, even in light of the 'Establishment' and 'Free Exercise' clauses of the First Amendment." *Id.* at 334, 341 A.2d at 107. Accordingly, the Court determined that the trial court erred by granting the church's preliminary objections in the nature of a demurrer, while noting, however, that, by the conclusion of the litigation,

"First Amendment [concerns] may present a complete and valid defense to the allegations of the complaint." *Id.* at 335, 341 A.2d at 108.

¶ 24 However, in the case *sub judice,* Appellants did not allege any facts showing that Appellees directed a "shunning" of Appellants or that Appellees acted in a manner that *excessively interfered* with the maintenance of marriage and family relationships, alienation of affection, or the tortious interference with business relationships. Moreover, the *Bear* Court left open the door to a dismissal of the plaintiff's complaint should the evidence show that the deference rule established a complete defense against the complaint's allegations. Here, the allegations set forth in Appellants' complaint, which in their entirety describe only the circumstances surrounding an ecclesiastical disciplinary decision, establish to our satisfaction that the deference rule prevents judicial review of Appellants' non-abandoned claims. Therefore, Appellants' reliance upon *Bear, supra* is unavailing.

¶ 25 We note again the basic principles as enunciated by this Court:

All who unite themselves to [ ] a [religious] body do so with an implied consent to [its] government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if anyone aggrieved by one of their decisions could appeal to the secular courts and have them reversed.

*Gaston, supra* at 760 (quoting *Kedroff, supra,* 344 U.S. at 114–15, 73 S.Ct. 143).

■ ¶ 26 Appellants, members of a religious community, who had voluntarily en-

discussing the salient issue of whether or when claims brought against a religious organization could be reviewed by civil courts, the Court *explicitly rejected* the analysis employed by this Court in *Gaston, supra. Calvary Christian School, supra* at 133, —— S.W.3d at ——.

rolled Eric in the community's religious school, were subject to the decisions of discipline and faith made by that community. "Absent allegations of acts against the public welfare or acts of immorality, or allegations of excessive interference within areas of paramount state concern," Appellants may not seek redress for such ecclesiastical decisions in the civil courts. *Gaston, supra* at 760 (citation and internal quotation marks omitted). Here, Appellants have not alleged acts against the public welfare or of immorality, or allegations of excessive interference within areas of paramount state concern. Rather, they have alleged injury based on their dissatisfaction with an ecclesiastical decision that they believe was unfairly made, and then unfairly disseminated within the religious community. Further, Appellants' non-abandoned claims essentially hinge upon judicial review of whether officials at a parochial school, in the course of their ecclesiastical disciplinary duties, correctly concluded that the object in Eric's possession, which admittedly contained two or more solid, pointed blade-like implements of at least two inches in length, was a penknife. Appellants' cause of action is clearly beyond the purview of our civil courts.

¶ 27 Having concluded that the trial court correctly determined that the deference rule without doubt prohibits review of Appellants' complaint, we conclude that the order dismissing the complaint and sustaining the preliminary objections of Appellees must be affirmed.

¶ 28 Order affirmed.