## Bonson v. Diocese of Altoona-Johnstown

C.P. of Westmoreland County, no. 3104 of 2003.

*Helen R. Kotler,* for plaintiff.
*Bruce A. Antkowiak* and *Adam B. Cogan,* for defendants Downey, Cherry and Campbell.
*Raymond F. Sekula,* for defendants Cherry and Campbell.
*Eric N. Anderson,* for defendants Diocese of Altoona-Johnstown, Bishops Adamec and Hogan, and Benedictine Society.

CARUSO, *J.,* May 11, 2004—Before the court are the preliminary objections filed by the defendants, Diocese of Altoona-Johnstown, Bishop Joseph V. Adamec, Bishop James Hogan, and Benedictine Society a/k/a Benedictine Society of Westmoreland County a/k/a St. Vincent Archabbey (the Diocesan defendants), and the defendants, Father Alvin T. Downey, Father Athanasius Cherry, and Father Andrew Campbell (the individual defendants). The plaintiff, Mary Bonson, filed preliminary objections

to the preliminary objections of the defendants with respect to defendants' request for dismissal of the suit based upon the expiration of the statute of limitations.

This court had denied the preliminary objections of all defendants by order of court dated February 2, 2004. Upon the defendants' motion for reconsideration and/or certification of questions for interlocutory appeal, this court granted reconsideration of the preliminary objections, vacated its prior order and reserved ruling on the certification of questions for interlocutory appeal upon the resolution of the preliminary objections. (See order of court dated 3/10/04.) Oral argument on the supplemental briefs filed in support of and in opposition to defendants' preliminary objections was held on April 22, 2004. This decision and order of court addresses the preliminary objections filed by the parties upon the court's reconsideration.

The salient facts were set forth in this court's decision accompanying its order dated February 2, 2004. The plaintiff is the mother of an adult son who was a minor during a period where he was allegedly sexually abused by the individual defendant, Father Downey, between approximately 1980 and 1981. (First am. compl. ¶2.) Plaintiff also alleges that in or around April 1981, her son was sexually abused and given drugs and alcohol by the individual defendants, Father Downey, Father Cherry and Father Campbell, all Benedictine priests, in an incident that occurred at St. Vincent Archabbey. (Compl. ¶3.) On approximately July 2, 2002, plaintiff was informed by her son of the sexual abuse. (Compl. ¶¶5, 42, 63, 73.) The plaintiff brought this action on her own behalf against the individual defendants and Diocesan defendants for intentional infliction of emotional distress

(Counts I and II), and against the Diocesan defendants for negligent infliction of emotional distress (Count III) and fraudulent concealment and misrepresentation (Count IV).

The standard of review of preliminary objections is a limited one. *AM/PM Franchise Association v. Atlantic Richfield Co.*, 526 Pa. 110, 121, 584 A.2d 915, 921 (1991). I must accept as true all material facts that are set forth in the complaint, as well as all inferences reasonably deducible therefrom. *Sherk v. County of Dauphin*, 531 Pa. 515, 516, 614 A.2d 226, 227 (1992). A demurrer cannot be granted unless the law says with certainty that no recovery is possible. *Id.* at 517, 614 A.2d at 227. Moreover, any doubt that exists as to whether a demurer should be sustained must be resolved in overruling the objection. *Id.*

The question for the court's determination is whether the plaintiff has sufficiently stated claims against these defendants upon which the law permits recovery. Upon reconsideration, the court finds that plaintiff has not sufficiently asserted claims against the individual defendants, Father Cherry and Father Campbell, for intentional infliction of emotional distress. Therefore, the preliminary objections filed by the individual defendants, Father Cherry and Father Campbell, will be sustained, and plaintiff's claims against these defendants shall be dismissed. In all other respects, this court affirms and incorporates herein its prior decision and order of February 2, 2004. As such, the remaining preliminary objections filed by the plaintiff, the individual defendant, Father Downey, and the Diocesan defendants will be overruled.

The individual defendants, Father Downey, Father Cherry and Father Campbell, filed a demurrer to plaintiff's claim against them for intentional infliction of emotional distress (IIED). Plaintiff's claim for IIED is asserted pursuant to subsection 46(1) of the Restatement (Second) of Torts for extreme and outrageous conduct of the individual defendants directed at plaintiff.

Plaintiff avers that it was reasonably foreseeable that a parent such as plaintiff, who was a religious and devout parishioner, and who completely trusted the Roman Catholic Church and its priests, would be emotionally harmed to learn that her son was sexually abused by a priest and that her trust of the priest may have played a part in the harm caused to her son. (Compl. ¶¶83, 84.) Plaintiff alleges that the individual defendants used their station to make plaintiff a facilitator or accomplice in abuse, and that she would not have encouraged such unfettered access by the priests to her son had they not been priests. (Compl. ¶82.) Plaintiff avers that a major and significant part of this claim is her realization that she had unwittingly become an accomplice to said abuse. (Compl. ¶89.)

The allegations against Father Cherry and Father Campbell, however, are distinguishable from plaintiff's allegations against Father Downey. The allegations pertaining to Father Cherry and Father Campbell refer to events that took place at St. Vincent Archabbey. Plaintiff has averred that her son was invited on this trip at the behest of Father Downey. (Compl. ¶59.) In her brief in opposition to these preliminary objections, plaintiff argues that the actions of Father Cherry and Father Campbell were reckless in that they intended their conduct to be secret. (Pl.'s brief in opp'n at 21.) She con-

tends that these defendants surely knew of the devastation that would occur to the parent who learned of such conduct after sending their child to the Archabbey with full confidence in the child's safety. (Pl.'s brief in opp'n at 21.)

Such allegations, without more, fail to sufficiently assert a claim against Father Cherry and Father Campbell for intentional infliction of emotional distress pursuant to subsection 46(1) of the Restatement (Second) of Torts. Absent from plaintiff's complaint are any allegations that Father Cherry and Father Campbell directed any extreme or outrageous conduct toward the plaintiff. Assuming the allegations of plaintiff's complaint as true, for purposes of these preliminary objections, the sole allegation against these two individual priests were that they inflicted and participated in sexual misconduct toward her son. There are no allegations that these defendants directed any conduct toward the plaintiff, or that they communicated with her or used their station as priests to persuade her to allow her son to visit the Archabbey such that they could gain access to her son. The allegations of a trust relationship with priests, upon which plaintiff's theory is based and which enabled her to become a facilitator or accomplice to said abuse, are simply absent with respect to Father Cherry and Father Campbell. Therefore, I find that plaintiff has failed to set forth claims against the individual defendants, Father Cherry and Father Campbell, for intentional infliction of emotional distress. The preliminary objections of Father Cherry and Father Campbell are, therefore, sustained; plaintiff's causes of action against Father Cherry and Father Campbell are hereby dismissed.

Plaintiff's relationship with and allegations against the individual defendant, Father Downey, who was a priest

at her parish, are distinctly different. Plaintiff and her son repeatedly had direct contact with Father Downey. Plaintiff avers that Father Downey held himself out as a trustworthy holy person. (Compl. ¶90.) Plaintiff alleges that Father Downey performed sexual acts on her son in her very own home. (Compl. ¶18.) It is alleged that Father Downey deceived her as to his true intentions toward her son for the purposes of gaining her compliance so that he could gain further access to her son. (Compl. ¶91.) Plaintiff avers that Father Downy caused harm to her directly by making her an accomplice or accessory to the secret acts of him and his friends. (Compl. ¶¶90-92.) She argues that Father Downey relied on the embarrassment and insecurity of a teenager not to disclose the events to his mother, but was reckless in that there was no guarantee that plaintiff would not become aware of what occurred. (Pl.'s brief in opp'n at 21.) Plaintiff maintains that any reasonable person would know the devastation to a parent in realizing their part in harming their child. (Pl.'s brief in opp'n at 21.)

In the allegations surrounding the nature of plaintiff's relationship with Father Downey, he is denoted as the pastor of her church and close friend of the family. Plaintiff's friendship and trust of Father Downey was the basis for her decisions to allow Father Downey into her home to supervise her son and was the basis for her encouragement of her son to befriend Father Downey and to participate in events and functions of the church, all of which allowed Father Downey increased access to her son. The nature of these allegations, should recovery be permitted in the courts of this Commonwealth under subsection 46(1) of the Restatement (Second) of Torts, are sufficient to set forth a claim for extreme and outra-

geous conduct of Father Downey that was directed at the plaintiff. This court cannot state with certainty that the law would not permit recovery for plaintiff's claim of intentional infliction of emotional distress against the individual defendant, Father Downey. Therefore, the preliminary objections filed by Father Downey are, again, overruled.

Apart from this court's decision that plaintiff's claims against the individual priests, Father Cherry and Father Campbell, are dismissed, this court relies upon and incorporates herein its decision and order of court dated February 2, 2004, as to its reasoning and rulings on the remaining preliminary objections. However, this court recognizes the dearth of case law on the novel issues presented by plaintiff to this court, and that any pronouncement as to the law of the Commonwealth on the issues presented are best left to our appellate courts. As such, the court finds that this decision and order involve controlling questions of law as to which there is substantial ground for difference of opinion, and that an immediate appeal from this decision and order may materially advance the ultimate termination of this matter.

## ORDER

And now, May 11, 2004, it is hereby ordered and decreed that the preliminary objections filed by the individual defendants, Father Cherry and Father Campbell, are sustained, and plaintiff's causes of action against these defendants for intentional infliction of emotional distress are dismissed; the remaining preliminary objections filed by the plaintiff, the individual defendant, Father Downey,

and the Diocesan defendants, the Diocese of Altoona-Johnstown, Bishop Joseph V. Adamec, Bishop James Hogan, and Benedictine Society a/k/a Benedictine Society of Westmoreland County a/k/a St. Vincent Archabbey, are overruled, consistent with this court's prior decision and order of court dated February 2, 2004.

This court further certifies that this order presents controlling questions of law as to which there is substantial ground for difference of opinion, and that an immediate appeal from this order may materially advance the ultimate termination of the matter.

---

CARUSO, *J.*, February 2, 2004—Preliminary objections have been filed by the defendants, Diocese of Altoona-Johnstown, Bishop Joseph V. Adamec, Bishop James Hogan, and Benedictine Society a/k/a Benedictine Society of Westmoreland County a/k/a St. Vincent Archabbey (the Diocesan defendants), and the defendants, Father Alvin T. Downey, Father Athanasius Cherry, and Father Andrew Campbell (the individual defendants). The plaintiff, Mary Bonson, has filed preliminary objections to the preliminary objections of the defendants with respect to defendants' request for dismissal of the suit based upon the expiration of the statute of limitations.

The plaintiff is the mother of an adult son who was a minor during a period where he was allegedly sexually abused by the individual defendant, Father Downey, between approximately 1980 and 1981. (First am. compl. ¶2.) Plaintiff also alleges that in or around April 1981, her son was sexually abused and given drugs and alcohol by the individual defendants, Father Downey, Father Cherry and Father Campbell, all Benedictine priests, in

an incident that occurred at St. Vincent Archabbey. (Compl. ¶3.) On approximately July 2, 2002, plaintiff was informed by her son of the sexual abuse. (Compl. ¶¶5, 42, 63, 73.) The plaintiff brought this action on her own behalf against the individual defendants and Diocesan defendants for intentional infliction of emotional distress (Counts I and II), and against the Diocesan defendants for negligent infliction of emotional distress (Count III) and fraudulent concealment and misrepresentation (Count IV).

The standard of review of preliminary objections is a limited one. *AM/PM Franchise Association v. Atlantic Richfield Co.,* 526 Pa. 110, 121, 584 A.2d 915, 921 (1991). I must accept as true all material facts that are set forth in the complaint, as well as all inferences reasonably deducible therefrom. *Sherk v. County of Dauphin,* 531 Pa. 515, 516, 614 A.2d 226, 227 (1992). A demurrer cannot be granted unless the law says with certainty that no recovery is possible. *Id.* at 517, 614 A.2d at 227. Moreover, any doubt that exists as to whether a demurrer should be sustained must be resolved in overruling the objection. *Id.*

First, the court will address the preliminary objections filed by the plaintiff to the preliminary objections of all defendants. Plaintiff argues that the defendants have improperly raised the statute of limitations defense in preliminary objections. Her argument is that the statute of limitations defense is not enumerated as a proper basis for preliminary objections in Pa.R.C.P. 1028(a). Rather, Pa.R.C.P. 1030 provides that the affirmative defense of the statute of limitations shall be pleaded in new matter. The defendants have responded that the defense is properly raised in preliminary objections because the

plaintiff specifically raised the statute of limitations in her first amended complaint. This court agrees.

When discussing the strict adherence to our procedural rules, the Superior Court, in *Bocchicchio v. General Public Utilities Corporation,* 456 Pa. Super. 23, 689 A.2d 305 (1997), noted the difference between raising an issue by preliminary objections as opposed to new matter. A preliminary objection sets forth a reason why the plaintiff's action is either legally or procedurally deficient. *Id.* at 29, 689 A.2d at 308. In new matter, the defendant avers that even if the allegations in the complaint are true, a defense exists to defeat the plaintiff's cause of action. *Id.* While both attempt to eradicate plaintiff's cause of action, the reasons behind sustaining such defenses or objections differ. *Id.*

In the instant matter, however, plaintiff has specifically pled the inapplicability of the statute of limitations defense to her causes of action. In addition to raising the discovery rule to toll the statute of limitations, (compl. ¶¶65-79), plaintiff sets out allegations that pertain to the defendants' waiver of the statute of limitations defense, (compl. ¶¶74, 76, 79) (containing allegations of estoppel and fraudulent concealment). Because the plaintiff has alleged reasons why the statute of limitations defense does not apply, and since she has already set forth specific allegations regarding how the defense has been waived by the defendants, this court will consider the issue of the statute of limitations on preliminary objections.

Although the abuse to her minor son occurred in 1980 and 1981, the plaintiff did not learn of the abuse until her son informed her on July 2, 2002. (Compl. ¶¶2, 73.)

Plaintiff pleads that the discovery rule permits her claims to go forward. (Compl. ¶65.) This rule tolls the statute of limitations and applies in extremely limited circumstances where the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed statutory period. *E.J.M. v. Archdiocese of Philadelphia,* 424 Pa. Super. 449, 454, 460, 622 A.2d 1388, 1391, 1394 (1993). In such cases, the plaintiff, despite the existence of objectively measured reasonable diligence, could not know of the injury and its cause within the limitations period. *Id.* at 460-61, 622 A.2d at 1394. The point at which the complaining party should reasonably be aware that he or she has suffered an injury is generally an issue of fact to be determined by the jury. *Id.* at 455, 622 A.2d at 1391 (quoting *Hayward v. Medical Center of Beaver County,* 530 Pa. 320, 325, 608 A.2d 1040, 1042-43 (1992)).

Plaintiff alleges that the conduct of the defendants that forms the basis of her claims against them for emotional distress and fraudulent concealment prevented her from discovering her causes of action against the defendants. (Compl. ¶¶65-72.) Furthermore, plaintiff avers that the Diocesan defendants are estopped from asserting the statute of limitations defense due to their fraudulent concealment of essential facts giving rise to plaintiff's causes of action. (Compl. ¶¶74, 76-79.) Whether the defendants acted to fraudulently conceal information from her to prevent her from discovering her causes of action involves a question of fact at this juncture. The resolution of when the plaintiff should have been aware of her claims and whether the defendants fraudulently withheld information from her cannot be resolved on the face of the complaint. Therefore, the defendants' preliminary objec-

tions based upon the statute of limitations will be overruled, without prejudice to the defendants to raise the statute of limitations defense in their new matter.

## I. DIOCESAN DEFENDANTS

### A. *Negligent Infliction of Emotional Distress*

The Diocesan defendants have filed preliminary objections to plaintiff's claim for negligent infliction of emotional distress (NIED). Although the bases for NIED claims commonly fall within the physical impact, zone of danger or bystander rules, *Shumosky v. Lutheran Welfare Services of Northeastern Pa. Inc.*, 784 A.2d 196, 199 (Pa. Super. 2001), our courts have recognized recovery in situations where the defendant owes the plaintiff a pre-existing duty of care, either through contract or a fiduciary duty, and breach of that duty causes the emotional distress alleged. *Corbett v. Morgenstern,* 934 F. Supp. 680, 683-84 (E.D. Pa. 1996); *Hunger v. Grand Central Sanitation,* 447 Pa. Super. 575, 595, 670 A.2d 173, 183 (1996) (Beck, J., concurring); *Armstrong v. Paoli Memorial Hospital,* 430 Pa. Super. 36, 50-53, 633 A.2d 605, 612-15 (1993); *Crivellaro v. Pennsylvania Power and Light Co.,* 341 Pa. Super. 173, 181, 491 A.2d 207, 212 (1985).

Assuming the averments in plaintiff's complaint to be true, the issue is whether the Diocesan defendants owed a fiduciary duty to the plaintiff. A fiduciary or confidential relationship is established where one places confidence in the integrity of others, who in turn accept or assume to accept the confidence. *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz,* 529 Pa. 241, 254 n.3, 602

A.2d 1277, 1283 n.3 (1992). Thereafter, the person in whom such confidence is placed cannot act to take advantage of the others' interests without their knowledge or consent. *Id.*

Plaintiff has alleged the following in support of her contention that the Diocesan defendants owed her a fiduciary duty. Through control of, and interaction with, the parish churches in the Diocese and their direct knowledge of the daily functioning of the various religious and recreation programs operating in each parish, the Diocesan defendants were aware that among the parishioners were a significant number of children and adolescents who, because of their very status as minors, were vulnerable to and trusting of priests placed in the parishes. (Compl. ¶19.) The Diocesan defendants were also aware that, among the parishioners, the parents of the children and adolescents trusted their children and adolescents to be safe with the priests placed in the parishes. (Compl. ¶20.) The Diocesan defendants were aware that the minor parishioners, through their participation in parish churches, parish schools, Diocesan secondary schools and Diocesan-sponsored and developed educational and/or recreational programs, had intimate, frequent, and often private contact with parish clergy and priests assigned by the Diocesan defendants. (Compl. ¶21.) As part of priests' duties, and in furtherance of cultivating a trusting relationship with children and adolescents, priests visited the children's homes to meet with the children and their parents. (Compl. ¶22.) These defendants knew and approved of the fact that minor parishoners were present at parish rectories (priest/clergy residences) for a variety of purposes. At all times, plaintiff maintained very close contact with the Roman Catholic Church, by

serving in many functions in the church, teaching classes, performing various functions to assist the church and trying to attend mass daily. (Compl. ¶¶27-28.) Plaintiff maintained a very strong faith, which she tried to instill in her children, encouraging them to participate in church affairs and encouraging her son to be an altar boy, where he met Father Downey. (Compl. ¶29.) The Diocesan defendants, Father Downey and other unnamed parish clergy, or those assigned to the parishes from the Benedictine Society, repeatedly instilled in each of its parishioners, including plaintiff, the belief that priests are figures of authority who should be relied upon to protect the well-being of children in the parishes of the Diocese. (Compl. ¶30.) Plaintiff believed and trusted the priests assigned to her parish, including and in particular, Father Downey. (Compl. ¶32,) Plaintiff also taught her son to obey priests and to rely on and trust them without doubt or question on issues affecting their physical and moral well-being, just as plaintiff did. (Compl. ¶31.)

Plaintiff avers that the defendant Bishop has a duty to exercise reasonable care to see that the priests assigned within parishes of the Diocese are not individuals who are dangerous to vulnerable parish members, and the defendant Benedictine Society had a duty to warn the Bishop of the dangerous sexual proclivities of a priest before he was assigned to a parish. (Compl. ¶108.) Plaintiff alleges that the Bishop and Benedictine Society knew or should have known that parents of minor children entrusted their children to attend church and serve as altar boys, go on outings or be in the presence of a priest, and that the parents would feel that their children were safe. (Compl. ¶109.) Plaintiff avers that the Diocesan defendants had a duty to not act in any way to place her

son in danger, and to advise her and other parish members if there was any danger to their children. (Compl. ¶¶111-112.).

As for the breach of such duty, plaintiff contends that the Diocesan defendants knew that Father Downey was unsafe and therefore removed him from the parish, and knew that there was misconduct at St. Vincent Archabbey, and within the Benedictine Society, so as to make it unsafe for a visiting minor. (Compl. ¶113.) Plaintiff alleges that the Diocesan defendants failed to warn plaintiff to be careful in allowing and encouraging her son to be alone with Father Downey or priests from the Benedictine Society. It is averred that the Defendants Bishop and Diocese had knowledge that certain priests assigned to its Diocese engaged in conduct unbecoming and/or acting in a manner dangerous to others, particularly minor children and adolescents. (Compl. ¶116.) Plaintiff alleges that the Diocesan defendants knew or should have known that plaintiff would suffer emotional distress if she learned that they had allowed her son to be sexually abused by a priest that they placed in her parish, or at a facility operated and owned by the Benedictine Society. (Compl. ¶117.) Finally, plaintiff avers that the Diocesan defendants negligently conspired to keep information regarding how certain priests that they had assigned within the Diocese had acted dangerously, knowing that plaintiff and other parents would suffer emotional distress once they learned that they had allowed or encouraged their children to be alone in the presence of trusted but dangerous priests who engaged in sexual misconduct. (Compl. ¶118.)

As a result of the alleged conduct of the Diocesan defendants, plaintiff has alleged that she sustained severe

anguish and trauma, necessitating psychiatric and medical care and treatment, including elevated cholesterol, nightmares, an inability to sleep causing exhaustion, and an increased risk of heart attack. (Compl. ¶119(a).)

Accepting the above allegations as true for the purpose of deciding these preliminary objections, the court cannot say with certainty that the Diocesan defendants did not owe a fiduciary duty to the plaintiff. Therefore, the preliminary objection to plaintiff's claim for negligent infliction of emotional distress will be overruled.

The Diocesan defendants argue that plaintiff has failed to aver that she suffered physical harm from the alleged negligence of the Diocesan defendants, as required to sufficiently plead a cause of action for NIED. See *Armstrong v. Paoli Memorial Hospital,* 430 Pa. Super. 36, 44, 633 A.2d 605, 609 (1993). The requirement that physical harm must accompany emotional distress to state a claim for NIED is based on the Restatement (Second) of Torts §436A. Temporary fright, nervous shock, nausea, grief, rage and humiliation, if transitory, are not compensable injuries. *Id.* Compensable harm does include long continued nausea or headaches, repeated hysterical attacks or mental aberration. *Id.* In *Armstrong v. Paoli Memorial Hospital, supra,* the Superior Court of Pennsylvania held that loss of continence at the time plaintiff learned of the conduct giving rise to her distress, coupled with allegations of depression, nightmares and insomnia, met the requirement of sufficiently averring physical injury. *Id.* Here, plaintiff alleges psychiatric and medical care and treatment, elevated cholesterol, nightmares, an inability to sleep causing exhaustion, and an increased risk of heart attack. These allegations are sufficient to aver physical harm.

## B. *Intentional Infliction of Emotional Distress*

Although the Supreme Court of Pennsylvania has never expressly recognized a cause of action for intentional infliction of emotional distress and has not formally adopted section 46 of the Restatement (Second) of Torts (1965), the court has cited this section as setting forth the minimum elements necessary to sustain a cause of action for IIED. *Taylor v. Albert Einstein Medical Center,* 562 Pa. 176, 754 A.2d 650, 652 (2000). This section provides:

"(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

"(2) *Where such conduct is directed at a third person,* the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

"(a) to a member of such person's immediate family who is *present at the time,* whether or not such distress result[ed] in bodily harm, or

"(b) to any other person who is present at the time, if such distress results in bodily harm." (emphasis in original)

In *Johnson v. Caparelli,* 425 Pa. Super. 404, 625 A.2d 668 (1993), the Superior Court of Pennsylvania affirmed the trial court's dismissal of the parents' claims for IIED. In *Johnson,* the minor child served as an altar boy and was hired by the defendant priest to perform occasional groundskeeping and maintenance at the church. The defendant priest developed a close relationship with the family of the minor son, and secured permission to take

him to the movies, for food and on short trips. Although the alleged abuse occurred from approximately September 1985 through June 1986, the parents did not learn of the incidents until 1991. The trial court sustained the defendant priest's preliminary objections to the parents' claims for IIED because they were not present when their minor son was allegedly sexually abused by the priest. The IIED claims in *Johnson,* however, were brought pursuant to subsection 46(2) of the Restatement because the parents alleged that they sustained severe emotional distress as a result of the sexual acts perpetrated by the defendant priest *on their son.* Because subsection 46(2) applied to individuals who suffered severe emotional distress as a result of outrageous conduct that is directed at a third party, the parents were required to satisfy the presence requirement under that subsection, which they failed to do.[1]

In the instant matter, plaintiff argues that her claim for IIED falls within the confines of subsection 46(1) of the Restatement, which does not require her to have been present at the alleged sexual abuse of her son. Plaintiff alleges that the Dioesan defendants engaged in extreme and outrageous conduct that was *directed at her,* causing her to suffer severe emotional distress.

It is for the court to determine, in the first instance, whether the Diocesan defendants' conduct may reason-

---

1. Although the parents of a deceased child recently argued in a medical malpractice action that they satisfied the elements of an IIED claim under subsection 46(1), the viability of a claim under subsection 46(1) was not the basis for the Superior Court's opinion, nor was it the subject of the allocatur grant. *Taylor v. Albert Einstein Medical Center,* 562 Pa. 176, 185 n.1, 754 A.2d 650, 654 n.1 (2000) (Castille, J., concurring).

ably be regarded as so extreme and outrageous to permit recovery. *Johnson,* 425 Pa. Super. at 441, 625 A.2d at 671. The availability of recovery under section 46 is highly circumscribed. The tortious conduct necessary for recovery is described as follows:

"(d) Extreme and outrageous conduct. The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortuous or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " Restatement (Second) of Torts §46 comment d

It is alleged in the complaint that the Diocesan defendants knew that Father Downey was unsafe and therefore removed him from the parish, and knew that there was misconduct at St. Vincent Archabbey, and within the Benedictine Society, so as to make it unsafe for a visiting minor. (Compl. ¶¶48, 113.) Plaintiff alleges that the Diocesan defendants knew or should have known that Father Downey and other Diocesan priests placed in the parishes of the Diocese or living at St. Vincent Archabbey had predatory sexual impulses toward chil-

dren and adolescents, permitted the dangerous priests to remain and failed to warn or advise the parents of the minors, all the while engaging in conduct to encourage parents in allowing their children to be in close proximity to the priests. (Compl. ¶¶25, 98.) The act of failing to warn parents, including the plaintiff, that they should not implicitly trust all priests, coupled with such knowledge, consisted of reckless acts directed at parents, in that parents who learned of the sexual abuse of their children were confronted with the discovery that they assisted in said acts by facilitating abuse. (Compl. ¶99.) Had the Diocesan defendants warned of said abuse, each parent could take steps to ascertain if sexual abuse was occurring and perhaps prevent sexual abuse or further sexual abuse. (Compl. ¶100.)

Accepting these allegations as true, the court cannot find that it is clear and free from doubt that such conduct is not extreme and outrageous on the part of the Diocesan defendants. The determination should be left to the fact-finder under such circumstances. Therefore, the Diocesan defendants' preliminary objections to plaintiff's claim for IIED will be overruled.

The Diocesan defendants also argue that the plaintiff has not alleged that she has suffered physical harm. While physical harm may be evidence in an action for IIED, it is not a necessary element to sustain such an action. Rather, there must be some objective proof of the severe emotional distress, *e.g.,* the alleged emotional distress must be supported by competent medical evidence. *Kazatsky v. King David Memorial Park,* 515 Pa. 183, 197, 527 A.2d 988, 995 (1987). The medical evidence need not show any physical harm. *Podolinski v. Episcopal Diocese of Pittsburgh,* 23 D.&C.4th 385, 406

(Armstrong Cty. 1995). Plaintiff has alleged that her distress required psychiatric and medical care and treatment. (Compl. ¶106(a).) Such allegations sufficiently allege objective proof of the emotional distress.

## C. *Fraudulent Concealment and Misrepresentation*

The plaintiff, in Count IV of her complaint, has brought a claim for fraudulent concealment and misrepresentation against the Diocesan defendants. The Diocesan defendants have filed preliminary objections contending that, upon the facts alleged, plaintiff has failed to state a cause of action for the same. The Diocesan defendants note that Pa.R.C.P. 1019(b) requires that "averments of fraud or mistake shall be averred with particularity" and must be sufficient to convince the court that the averments are not merely artifice. *Bash v. Bell Telephone Co.,* 411 Pa. Super. 347, 359, 601 A.2d 825, 831 (1992).

The following elements must be pled with particularity in order to make out a prima facie case for fraud and misrepresentation:

"(1) a misrepresentation;

"(2) a fraudulent utterance thereof;

"(3) an intention by the maker that the recipient will thereby be induced to act;

"(4) justifiable reliance by the recipient upon the misrepresentation; and

"(5) damage to the recipient as the proximate result." *Elia v. Erie Insurance Exchange,* 398 Pa. Super. 433, 438, 581 A.2d 209, 211-12 (1990).

Intentional non-disclosure, or fraudulent concealment, has the same elements as the tort of intentional misrep-

resentation, with the exception that the party intentionally conceals a material fact rather than making an affirmative representation. *Duquesne Light Co. v. Westinghouse Electric Corp.,* 66 F.3d 604, 612 n.6 (3d Cir. 1995) (citing *Gibbs v. Ernst,* 538 Pa. 193, 207 n.12, 647 A.2d 882, 889 n.12 (1994)). A misrepresentation by concealment will occur if the matter concealed was material. *Sevin v. Kelshaw,* 417 Pa. Super. 1, 611 A.2d 1232 (1992). That is, if the matter had been revealed, would the person receiving the information have acted differently with regard to a matter of importance to them. Fraud arises where the misrepresentation is false or where there is an intentional concealment calculated to deceive. *Quashnock v. Frost,* 299 Pa. Super. 9, 16, 445 A.2d 121, 124 (1982). Concealment may constitute fraud, but mere silence is not sufficient in the absence of a duty to speak. *Smith v. Renaut,* 387 Pa. Super. 299, 564 A.2d 188 (1989). The plaintiff must prove a causal connection between the representations and the alleged harm in order to prevail on a claim of fraudulent misrepresentation. *Petrucelli v. Bohringer and Ratzinger,* 46 F.3d 1298 (3d Cir. 1995).

In the complaint, plaintiff avers that the Diocesan defendants intentionally concealed their true knowledge and notice of the problem of sexually abusive priests in the Diocese, which prevented plaintiff from protecting her son and taking action against the defendants. (Compl. ¶¶122, 123, 137.) Plantiff alleges that the Diocesan defendants knew that devoted parishioners revered and trusted priests such that, when the Diocesan defendants became aware that certain priests were engaging in sexual abuse, they had a duty to warn the parishioners not only of the dangers of those specific priests, but to encourage the parishioners to be cautious, to question and not im-

plicitly trust, and even to report to the Diocesan defendants any suspicious behavior of priests. (Compl. ¶¶125, 126.) Plaintiff avers that the Diocesan defendants continually concealed their knowledge of Father Downey's predilections well before the time that plaintiff's son was abused. (Compl. ¶¶135, 137.)

Plaintiff's lack of knowledge as to the priests involved with her son was the result of the Diocesan defendants' alleged failure to provide her with information that was material to her decisions regarding the relationship of her son with the priests. Plaintiff avers that the Diocesan defendants knew about the conduct of the priests, failed to inform her of the same and that, had she known this information, she would have acted differently. Plaintiff has sufficiently pled a cause of action for fraudulent concealment and misrepresentation. The Diocesan defendants' preliminary objections to this claim will be overruled.

### D. *Scandalous and Impertinent Information*

The Diocesan defendants have moved to strike the allegations contained in paragraphs 128-131 of plaintiff's first amended complaint, which describe specific acts and conduct of another priest, Father Coleman. To be scandalous and impertinent, the allegations must be immaterial and inappropriate to the proof of the cause of action. *Common Cause/Pennsylvania v. Commonwealth*, 710 A.2d 108, 115 (Pa. Commw. 1998).

The plaintiff has averred that the Diocesan defendants knew of misconduct of other priests in the Diocese. The Diocesan defendants placed Father Coleman at her parish prior to Father Downey's arrival. (Compl.

¶¶128-133.) Information gathered from the media regarding complaints of sexual misconduct against Father Coleman prompted plaintiff to question her son if he had been abused by Father Coleman. (Compl. ¶¶131, 132.) Plaintiff alleges that, had she been informed of the alleged misconduct of Father Coleman by the Diocesan defendants, she would have been aware of the need not to implicitly trust the motives of Father Downey as being honest or safe. (Compl. ¶133.) It follows that knowledge of Father Coleman's misconduct may have prevented the sexual abuse of her son by the individual defendants. Therefore, averments of the specific acts of sexual misconduct committed by Father Coleman are material and relevant to the instant action. The preliminary objection to strike paragraphs 128 through 131 of the plaintiff's complaint will be denied.

## E. *Subject Matter Jurisdiction*

The Diocesan defendants argue that the court lacks subject matter jurisdiction over plaintiff's claims because the First and Fourteenth Amendments to the United States Constitution protect the free exercise of religion and against excessive entanglement of the state in matters of the church. (Diocesan defs.' brief in supp. of prelim. obj. at 29.) Courts may not inquire into ecclesiastical questions, *i.e.,* where the resolution of an issue involves questions of discipline, faith, ecclesiastical rule, custom or law. *Presbytery of Beaver-Butler v. Middlesex Presbyterian Church,* 507 Pa. 255, 260, 489 A.2d 1317, 1319-20 (1985) (citing *Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952)).

However, not all disputes involving religious institutions are doctrinal disputes. *Orthodox Church of America v. Pavuk,* 114 Pa. Commw. 176, 181, 538 A.2d 632, 634 (1988). Some disputes involve principles of civil law that may be resolved upon consideration of neutral principles without intruding into the sacred precincts of the church. *Id.* These disputes are not predicated on any religious doctrine, and the approach is completely secular in operation. *Presbytery of Beaver-Butler,* 507 Pa. at 263, 489 A.2d at 1321.

Therefore, a threshold determination must be made as to whether plaintiff's dispute is one that is doctrinal in nature or, instead, involves only questions of civil law. *Atterberry v. Smith,* 104 Pa. Commw. 550, 555, 522 A.2d 683, 685 (1987). Plaintiff's causes of action against the defendants for intentional infliction of emotional distress, negligent infliction of emotional distress and fraudulent concealment and misrepresentation stem from conduct that is purely a state concern. A resolution of these tort claims based in civil law does not involve interpretation of doctrinal or theological matters. See *Presbytery of Beaver-Butler,* 507 Pa. at 261-62, 489 A.2d at 1320-21. In cases where the resolution of a dispute involved no inquiry into ecclesiastical questions, the court is to apply the same principles of law as would be applied to non-religious associations. *Gaston v. Diocese of Allentown,* 712 A.2d 757, 760 (Pa. Super. 1998).

As set forth by the Supreme Court of the United States in *Watson v. Jones,* 80 U.S. 679, 20 L.Ed. 666, 13 Wall. 679 (1871):

"In this country the full and free right to entertain any religious belief, to practice any religious principle, and

to teach any religious doctrine *which does not violate the laws of morality and property, and which does not infringe personal rights,* is conceded to all." 80 U.S. at 728. (emphasis added)

Plaintiff's allegations are predicated on the Diocesan defendants' failure to provide her with information essential to her decisions regarding her minor son and his relationships with, and access to, priests. Furthermore, plaintiff avers that the defendants used their revered position to gain her trust in an effort to gain access to her son and, in doing so, made her a facilitator of, or accessory to, the abuse. Allegations of acts against the public welfare or acts of immorality are areas of paramount state concern, which the court has authority to regulate. See *Gaston,* 712 A.2d at 760. The United States Supreme Court, in *Watson v. Jones, supra,* discussed this principle in terms of jurisdiction.

"[I]f the General Assembly of the Presbyterian Church should undertake to try one of its members for murder, and punish him with death or imprisonment, its sentence would be of no validity in a civil court or anywhere else. Or if it should at the instance of one of its members entertain jurisdiction as between him and another member as to their individual right to property, real or personal, the right in no sense depending on ecclesiastical questions, its decision would be utterly disregarded by any civil court where it might be set up. And it might be said in a certain general sense very justly, that it was because the General Assembly had no jurisdiction of the case." 80 U.S. at 733.

Excessive entanglement issues do not arise merely because such allegations implicate members of a reli-

gious organization. "When a civil right depends upon an ecclesiastical matter, it is the civil court and not the ecclesiastical which is to decide. But the civil tribunal tries the civil right, and no more, taking the ecclesiastical decisions out of which the civil right arises as it finds them." *Watson,* 80 U.S. at 731. Accordingly, this court properly has subject matter jurisdiction over plaintiff's claims, which will involve the application of neutral principles of civil law. The defendants' preliminary objection for lack of subject matter jurisdiction, therefore, will be overruled.

## II. INDIVIDUAL DEFENDANTS

The individual defendants, Father Downey, Father Cherry and Father Campbell, have filed a demurrer to plaintiff's claim against them for intentional infliction of emotional distress. As noted above, plaintiff's claim for IIED is asserted pursuant to subsection 46(1) of the Restatement (Second) of Torts, which does not have a presence requirement, for extreme and outrageous conduct of the individual defendants directed at her.

Plaintiff avers that it was reasonably foreseeable that a parent such as plaintiff, who was a religious and devout parishioner and who completely trusted the Roman Catholic Church and its priests, would be emotionally harmed to learn that her son was sexually abused by a priest and that her trust of the priest may have played a part in the harm caused to her son. (Compl. ¶¶83, 84.) Plaintiff alleges that the individual defendants used their station to make plaintiff a facilitator or accomplice in abuse, and that she would not have encouraged such unfettered access by the priests to her son had they not been

priests. (Compl. ¶82.) Plaintiff avers that a major and significant part of this claim is her realization that she had unwittingly become an accomplice to said abuse. (Compl. ¶89.)

The allegations against Father Cherry and Father Campbell refer to events that took place at St. Vincent Archabbey. Plaintiff has averred that her son was invited on this trip at the behest of Father Downey. (Compl. ¶59.) In her brief in opposition to these preliminary objections, plaintiff argues that the actions of Father Cherry and Father Campbell were reckless in that they intended their conduct to be secret. (Pl.'s brief in opp'n. at 21.) She contends that these defendants surely knew of the devastation that would occur to the parent who learned of such conduct after sending their child to the Archabbey with full confidence in the child's safety. (Pl.'s brief in opp'n at 21.)

Father Downey was a priest at her parish, with whom plaintiff and her son repeatedly had direct contact. Plaintiff avers that Father Downey held himself out as a trustworthy holy person. (Compl. ¶90.) Plaintiff alleges that Father Downey performed sexual acts on her son in her very own home. (Compl. ¶18.) It is alleged that Father Downey deceived her as to his true intentions toward her son for the purposes of gaining her compliance so that he could gain further access to her son. (Compl. ¶91.) Plaintiff avers that Father Downey caused harm to her directly by making her an accomplice or accessory to the secret acts of him and his friends. (Compl. ¶¶90-92.) She argues that Father Downey relied on the embarrassment and insecurity of a teenager not to disclose the events to his mother, but was reckless in that there was

no guarantee that plaintiff would not become aware of what occurred. (Pl.'s brief in opp'n. at 21.) Plaintiff maintains that any reasonable person would know the devastation to a parent in realizing their part in harming their child. (Pl.'s brief in opp'n. at 21.)

Based upon plaintiff's allegations against Father Cherry, Father Campbell and Father Downey, this court cannot say with certainty that a cause of action does not exist against these defendants for IIED. It is not clear and free of all doubt that the individual defendants were not aware of the emotional harm that would be caused to plaintiff as a result of their alleged actions toward plaintiff's son. Therefore, the preliminary objections to plaintiff's claim against the individual defendants for IIED will be overruled.

## ORDER

And now, February 2, 2004, it is hereby ordered and decreed as follows:

(1) The plaintiff's preliminary objections to the preliminary objections of the defendants based upon the statute of limitations is overruled.

(2) With respect to the preliminary objections filed by the defendants, Diocese of Altoona-Johnstown, Bishop Joseph V. Adamec, Bishop James Hogan, and Benedictine Society a/k/a Benedictine Society of Westmoreland County a/k/a St. Vincent Archabbey (the Diocesan defendants), and the defendants, Father Cherry, Father Campbell and Father Downey (individual defendants), said preliminary objections are overruled.