**North American Knanaya Diocese Inc. v. Chirayl**

C.P. of Philadelphia County, June Term, 2014 No. 00181

*Constantine Z. Economides*, for plaintiffs.
*Henry I. Langsam* and *Denise A. Kuestner*, for defendants.

MCINERNEY, *J.*, Dec. 15, 2015—Defendants' preliminary objections require this court to determine whether it lacks subject matter jurisdiction pursuant to the rule of deference, a legal rule which compels legal tribunals to yield to the decisions of the highest authorities of any church in matters of internal discipline, faith, and ecclesiastical rule. For the reasons below, this court finds that it does lack subject matter jurisdiction and plaintiffs' complaint is dismissed.

## Background

Plaintiff, the North American Knanaya Diocese, Inc. ("NAKDI"), is a not-for-profit corporation organized under the laws of Pennsylvania. Plaintiff, St. Mary's Knanaya Church, Inc. ("St. Mary's"), is also a not-for-profit corporation organized under the laws of Pennsylvania. The Church of St. Mary's is located in Philadelphia, Pennsylvania. Whenever required, NAKDI and St. Mary's will be identified collectively as "plaintiffs." Defendants (hereinafter "defendants"), are board members or officers of St. Mary's, or more simply members of that church.

The members of NAKDI and St. Mary's appear to trace their religious lineage to ancient Christians who emigrated from upper Mesopotamia to India, possibly in the fourth century A.D. The members of NAKDI and St. Mary's are part of a larger religious community. At the head of this larger community is a "Patriarch" who leads the Universal Syrian Orthodox Church (the "Universal Syrian Orthodox

Church"), from Damascus, Syria.[1] In India, the Universal Syrian Orthodox Church is present as an archdiocese known as the Malankara Suriyani Knanaya Samudayam ("MSKS")[2]. The rules governing the MSKS are contained in a "constitution" which originated in 1952.[3] The head of the MSKS is the "chief metropolitan" who leads the MSKS from the city of Chingavanam, Kerala, Indian.[4] Under the MSKS constitution,

> [t]here shall be one metropolitan as the chief/head of the community and if the Knanaya association considers it necessary, then assistant bishops can be elected as per the law, have them ordained and their duties and responsibilities shall be decided by the Metropolitan in consultation with the association.[5]

The MSKS has under its control four distinct administrative regional units (the "Dioceses"), each of which is under the immediate authority of a "metropolitan."[6] Of the four Dioceses within the MSKS,

---

1. Letterhead, Patriarch Bull No. EI 29/14, attached as Exhibit X to the preliminary objections of defendants.

2. The MSKS was elevated to the status of archdiocese by a Patriarch Bull dated January 10, 2007, as restated by Patriarch Bull No. E338/11 dated 19 December 2011 attached as Exhibit A to plaintiff's complaint.

3. Constitution of the Malankara Suriani Knanaya Community, ¶ 2, Exhibit E to the preliminary objections of defendants.

4. Letterhead from Directive Letter No. 109/14, issued by the chief metropolitan of the MSKS, dated 12-16-2014, Exhibit Q to the preliminary objections of defendants.

5. Constitution of the Malankara Suriani Knanaya Community, ¶ 82, Exhibit E to the preliminary objections of defendants.

6. "In ecclesiastical language, [the term Metropolitan] refers to whatever relates to the metropolis, the principal city, or see, of an ecclesiastical province; thus we speak of a metropolitan church, a metropolitan chapter, a metropolitan official, etc. The word *metropolitan*, used without any qualificative, means the bishop of the metropolitan

three are located in India while the fourth straddles North America and Europe. Plaintiffs NAKDI and St. Mary are within the North America-and-Europe administrative regional unit of the MSKS, and the archbishop in charge of this unit is metropolitan Silvanos Ayub ("metropolitan Ayub").[7] According to the complaint, the North America-and-Europe administrative regional unit was created to serve "the spiritual, social, cultural and educational needs" of large numbers of MSKS members who emigrated to North America in the middle of the 20th century.[8]

On December 19, 2011, the Patriarch of the Universal Syrian Orthodox Church issued an Apostolic Bull, No. E338/11, which stated in pertinent part:

Apostolic Benediction....

\*\*\*

The metropolitans including the chief metropolitan shall not interfere in the administrative affairs including the ordination of priests and deacons and the appointment and transfer of Vicars and Assistant Vicars of the region assigned to the others....[9]

On January 14, 2012, metropolitan Ayub forwarded

---

see, now usually styled *archbishop*." Catholic Encyclopedia (1913), ed. August Boudinhon, as reported at http://www.catholic.org/encyclopedia/view.php?id=7939.

7. Patriarch Bull No. E338/11 dated 19 December 2011, attached as Exhibit A to plaintiff's complaint. The Bull specifically stated: "[w]e have already assigned the charge of the Knanaya Churches of North America, Canada & Europe to Mor. Silvanos Ayub by an earlier Apostolic Bull."

8. Complaint, footnote 3.

9. Patriarch Bull No. E338/11 dated 19 December 2011, attached as Exhibit A to plaintiff's complaint.

directives to the Vicar of St. Mary's, herein defendant the Reverend Father Chacko Punnose ("Father Punnose"). The directives specifically stated:

Blessings....

\*\*\*

During my last visit to the parish...Rev. Fr. Chacko Punnose...expressed his desire to be relieved of his responsibilities as the Vicar of that parish due to medical reasons. We accepted his request....

Now we are pleased to appoint Rev, Fr. M.S. Cherian Moozhil as the vicar of that parish effective from January 15th 2012....[10]

Plaintiffs' complaint avers that on September 15, 2013, during a body meeting of the members of St. Mary's, defendants herein acted "in a disorderly and disruptive manner," assaulted the new Vicar in the presence of the members and their families, and forced the premature dismissal of the meeting.[11] As a result of this incident, Metropolitan Ayub, by a directive letter dated January 11, 2014, barred elections for the selection of new office bearers and instituted a board of receivers to administer the affairs of St. Mary's on an interim basis. The letter, addressed to the Vicar, members of the managing committee and the faithful of St. Mary's, specifically stated:

---

10. Directive Letter from metropolitan Ayub, dated January 14, 2012.
11. Complaint, ¶¶ 42-45.

Blessings....

\* \* \*

[T]he parish/church managing committee has been barred from convening any meeting since September 20, 2013. Since the official term of the church/parish committee ended on December 31, 2013, the new office bearers for the year 2014 need to be elected by the parish general body. We have decided however that it is not yet time to call the annual parish general body meeting to elect the new office bearers for the year 2014 as we are told tensions in the parish are still high.

As an interim measure, we hereby appoint [a] board of receivers...with effect from January 12, 2014....

The outgoing treasurer and secretary are hereby directed to hand over all documents, accounts and remaining funds to the board of receivers immediately....[12]

On January 19, 2014, the chief metropolitan in India countermanded the above-quoted directives and restored the outgoing office bearers who had been removed by metropolitan Ayub. The countermanding directives from the chief metropolitan specifically stated:

Blessings....

This I am writing in reference to [metropolitan Ayub's directives] dated 11-01-2014 wherein [Metropolitan

---

12. Directive letter from metropolitan Ayub dated January 11, 2014, Exhibit K to the complaint.

Ayub] has barred convening the parish annual general body meeting to elect the office bearers for the year 2014 but appointed a board of receivers...

[W]e hereby restore the authority and responsibilities of the present democratically elected board of directors of the Parish (managing committee) till a new managing committee shall function as per the church laws and corporate formalities....[13]

On February 15, 2014, both the chief metropolitan from India, and metropolitan Ayub from North America, issued conflicting directives to St. Mary's. The directives issued from India by the chief metropolitan stated:

[W]e hereby relieve the present Vicar of the Church, Rev. Fr. E.M. Abraham Edarhundimepurathu and appoint Rev. Fr. Chacko Punnose...as the vicar of St. Mary's...with effect from 15.2.2014.[14]

By contrast, the directives issued on the same day from North America by Metropolitan Ayub stated:

Blessings....

Dear Rev. Fr. Chacko Punnose....

We want to remind you about our Bull No. SA69/13 dated November 4th 2013 which clearly prohibits you from conducting any sacraments of the Syrian

13. Directive letter from the chief metropolitan dated January 19, 2014, Exhibit O to the preliminary objections of defendants.
14. Directive Letter from the chief metropolitan dated February 15, 2014, Exhibit P to defendants' preliminary objections.

Orthodox Church without our prior written permission in any of the parishes of North America, Canada and Europe region.

\*\*\*

We also remind you about the apostolic Bull No. 338/11 dated December 19th, 2011 of *His Holiness Moron Mor Ignatius Zakka I Iwas*, Patriarch of Antioch and All the East, the Supreme Head of our Church which states *"We have already assigned the charge of the Knanaya churches in North America, Canada & Europe to Mor Silvanos Ayub by an earlier Apostolic Bull. The Metropolitans including the Chief Metropolitan shall not interfere with the administrative affairs ... including the appointment and transfer of Vicars and Assistant Vicars of the Regions assigned to others"*[15]

On June 2, 2014, plaintiffs filed the instant complaint. according to the complaint, defendants filed false statements with the Pennsylvania Department of State in an effort to amend St. Mary's articles of incorporation and to achieve unlawful control of the church and its assets.[16] The Wherefore Clause of the complaint prays for the following types of relief:

Plaintiffs respectfully request that this honorable court enter an order:

---

15. Letter dated February 14, 2014, from metropolitan Ayub to the Rev. Fr. Chacko Punnose, Exhibit O to the complaint.

16. *Id.* ¶¶ 63-64. The alleged fraudulent filings with the Pennsylvania Department of State are attached to the complaint as Exhibit N.

(a) Declaring that metropolitan Silvanos is the highest hierarch in the North American Knanaya Diocese;

(b) Declaring that St. Mary's is under the exclusive jurisdiction of the North American Knanaya Diocese and its metropolitan;

(c) Declaring that only clergy appointed by the metropolitan of the North American Knanaya Diocese can be assigned to and conduct services at St. Mary's;

\*\*\*

(g) Prohibiting defendants from holding themselves out as the rightful agents and representatives of St. Mary's;

(h) Prohibiting defendants from holding themselves out as the rightful agents and representatives of St. Mary's in letters, emails, and other communications addressed to the members of St. Mary's....[17]

In addition, the afore-mentioned Wherefore Clause asks this court to direct defendants to immediately return any church-owned property to plaintiffs, including "any and all keys, funds, minute books, rosters [and] directories."[18]

On July 31, 2014, after commencement of the instant action, the Patriarch of the Universal Syrian Orthodox Church issued an Apostolic Bull, No. EI29/14, which stated in pertinent part:

Apostolic Benediction....

_____

17. Complaint, Wherefore Clause.
18. *Id.* ¶ (i).

\*\*\*

We wish to reaffirm that Malankara Syrian Knanaya Archdiocese is and will continue to be one entity with his Eminence Mor. Severios Kuriakose as the chief metropolitan. It has four administrative regional units with...Mor. Silvanos Ayub as the Metropolitan of the North America, Canada and Europe region....[19]

On July 9, 2014, defendants filed preliminary objections to the complaint.

## Discussion

At the onset, the court notes that

[p]reliminary objections in the nature of a demurrer test the legal sufficiency of the complaint. When considering preliminary objections, all material facts set forth in the challenged pleadings are admitted as true, as well as all inferences reasonably deducible therefrom. Preliminary objections which seek the dismissal of a cause of action should be sustained only in cases in which it is clear and free from doubt that the pleader will be unable to prove facts legally sufficient to establish the right to relief. If any doubt exists as to whether a demurrer should be sustained, it should be resolved in favor of overruling the preliminary objections.[20]

Defendants' preliminary assert that this court lacks

19. Patriarch' Apostolic Bull No. EI29/14, dated July 31, 2014, Exhibit X to the preliminary objections of defendants.
20. *Feingold v. Hendrzak*, 2011 Pa. Super 34, 15 A.3d 937, 941 (2011).

subject matter jurisdiction under the rule of deference, a rule, adopted by the U.S. Supreme Court and followed in Pennsylvania, which compels legal tribunals to yield to the decisions of the highest authorities of any church in matters of internal discipline, faith, and ecclesiastical rule.

The law on the rule of deference is well settled:

whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them in their application to the case before them.[21]

[T]he first and fourteenth amendments [of the United States Constitution] permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the constitution requires that civil courts accept their decisions as binding upon them.[22]

This court has reviewed the evidence of record

---

21. *Presbytery of Beaver-Butler of United Presbyterian Church in U.S. v. Middlesex Presbyterian Church*, 507 Pa. 255, 259, 489 A.2d 1317, 1319 (1985) (citing *Watson v. Jones*, 80 U.S. 679; 20 L.Ed. 666 (13 Wall. 1871)).

22. *Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 724-25, 96 S. Ct. 2372, 2387-88, 49 L. Ed. 2d 151 (1976).

to determine whether it should assert subject matter jurisdiction over the issues in the instant litigation, or whether it should defer to the highest judicatory authorities within the Universal Syrian Orthodox Church. Upon a review of that record, this court has found the existence of patent ambiguities involving questions of discipline, or faith, or ecclesiastical rule, custom, or canonic law, which stem specifically from the appointment and subsequent removal of a board of receivers of St. Mary's, as well as the appointment and subsequent removal of the vicars in charge of that church. For example, the highest written laws of the MSKS, as embodied in its constitution, declare that the chief metropolitan of the MSKS is empowered with authority and greater status over any assistant bishop whom he may ordain and task with duties and responsibilities.[23] However, the authority granted to the chief metropolitan under the MSKS constitution appears to be undermined by the Patriarch's Apostolic Bull No. E338/11, dated January 19, 2014, which precludes the chief metropolitan from interfering with the appointment and transfer of vicars in the regions assigned to other metropolitans.[24] In addition, a second ambiguity appears on the face of the record: while the afore-mentioned Patriarch's Bull No. 338/11 forbids the chief metropolitan from interfering in matters involving the appointment and transfer of vicars in regions assigned to other Metropolitans, a subsequent Patriarch's Bull, No. EI29/14. "reaffirms" that the Malankara Syrian Knanaya

---

23. MSKS Constitution, 1 82, Exhibit A to Plaintiffs' complaint.
24. Patriarch Bull No. E338/11 dated 19 December 2011, attached as Exhibit A to plaintiff's complaint.

Archdiocese, including NAKDI, and St. Mary's, "is and will continue to be one entity with His Eminence Mor. Severios Kuriakose as the chief metropolitan,"[25] This last Bull suggests that the chief metropolitan enjoys absolute primacy over the MSKS and St. Mary's in contradiction with the injunctions contained in the earlier Apostolic Bull No. 338/11 dated December 11, 2011. Thus, it appears on the face of the record that the highest judicatory authority within the Universal Syrian Orthodox Church, the Patriarch, has provided directives explaining the hierarchical structure thereof, albeit in what appear to be ambiguous and contradictory statements. However, no matter how the Patriarch has spoken, this court must adhere to the well established rule of deference unless it becomes convinced otherwise by the arguments offered by plaintiffs in their response in opposition to the preliminary objections.

In the response in opposition to the preliminary objections, plaintiffs argue that this court has subject matter jurisdiction. Plaintiff rely on *Poesnecker v. Ricchi*, 158 Pa. Cmwlth. 459, 631 A.2d 1097 (Pa. Cmwlth. 1993) to assert that this court has subject matter jurisdiction to declare metropolitan Ayub as the highest authority over NAKDI and St. Mary's, and that his decisions, including the appointments of a board of receivers and a Vicar, may not be challenged by defendants.[26] Plaintiffs' reliance on *Poesnecker* is misplaced. Reliance on *Poesnecker* is misplaced because the rule of deference was

_____

25. Patriarch's Apostolic Bull No. EI29/11 dated July 31, 2014, Exhibit X to the preliminary objections of defendants.
26. Plaintiffs' memorandum of law in support of their response in opposition to defendants' preliminary objections, pp. 5-12.

not applicable in that case.

In *Poesnecker*, the "Supreme Grand Master" of a partly-religious fraternal organization had been voted out of office by a council of Seven (the "council"). Subsequently, the Supreme Grand Master instituted an action against the individual members of that council.[27] In the action, the Supreme Grand Master prayed for relief which included a declaration enjoining the dissident members of the council from interfering with his position as the highest authority in the organization. The court agreed with the Supreme frand master and ordered that his supreme authority could not be disturbed.[28] The members of the council appealed, and the issue before the Commonwealth Court was whether the trial court had violated the Unites States Constitution by "improperly determining the entirely religious question of who should be the spiritual leader" of the fraternal organization.[29] The Commonwealth Court first noted that it was bound under the rule of deference to accept the decisions of the "highest judicatories of a religious organization of hierarchical policy on matters of discipline, faith, internal organization or ecclesiastical rule."[30] Next, the Commonwealth Court noted that church matters "involving agreements on will, trusts, contracts and property ownership are questions of civil law and are not predicated on any religious doctrine."[31] At last, the

---

27. *Poesnecker v. Ricchi*, 158 Pa. Cmwlth. 459, 456; 631 A.2d 1097,1101 (Pa. Cmwlth. 1993)
28. *Id.* at 466; 1101.
29. *Id.*
30. *Id.* at 469-470; 1103.
31. *Id.* at 470; 1103.

Commonwealth Court inquired into whether the decision to remove the Supreme Grand Master had been made by the highest judicatories within the fraternal organization. To determine whether the decision to remove the Supreme Grand Master had been decided by the highest judicatories, the Commonwealth Court examined the laws binding the fraternal organization -in this case, the "organic laws" of that fraternity.[32] The court analyzed the preamble to the organic laws and determined that the fraternal organization was hierarchical in nature and the council was subordinate to the Supreme Grand Master.[33] Accordingly, the Commonwealth Court determined that the decision to remove the Supreme Grand Master had been made by a body which was not the highest judicatory authority within the fraternal organization. Consequently, the Pennsylvania Commonwealth Court agreed with the trial court and held that the removal of the Supreme Grand Master was invalid because it had been decided by a body lacking the status of highest judicatory authority. In other words, the Pennsylvania tribunals were not bound in that action by the rule of deference because the decision to remove the Supreme Grand Master had been rendered not by a body empowered with the highest judicatory authority, but by a body of inferior rank.

In conclusion, whereas the Pennsylvania tribunals in *Poesnecker* were not bound by the rule of deference, this court is bound by that rule because the highest judicatory authority within the Universal Syrian Orthodox Church

---

32. *Id.* at 471; 1103.
33. *Id.* at 471; 1103-1104.

122

-namely, the Patriarch, has defined the hierarchical structure within the Universal Syrian Orthodox Church in general, and the MSKS and St. Mary's in particular, with ambiguous, if not contradictory statements. As such, this court finds that it cannot decide the present dispute without entangling itself in open questions of church structure and therefore finds this court lacks subject matter jurisdiction over the dispute in this action and sustains the preliminary objections of defendants.

The court shall issue a simultaneous order consistent with this *memorandum* opinion.

### ORDER

And now, this 15th day of December, 2014, upon consideration of the preliminary objections of defendants, the response in opposition of plaintiffs, the reply brief of defendants, and all matters of record, it is ordered that the preliminary objections are sustained and plaintiffs' complaint is dismissed in its entirety.