Laura M. Magone, Barbara Falappi,  :
Joseph Ravasio, Jean J. Rieppi, and  :
Kimberly A. Yarvorsky, Individually and :
on Behalf of the Roman Catholic  :
Congregation of Saint Anthony,  :
       Appellants  :
           :
    v.      : No. 1351 C.D. 2018
           : ARGUED: May 6, 2019
The Diocese of Pittsburgh, and the  :
Most Reverend David A. Zubik,  :
Diocesan Bishop      :


BEFORE: MARY HANNAH LEAVITT, President Judge
    HONORABLE RENÉE COHN JUBELIRER, Judge
    HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


**OPINION NOT REPORTED**

**MEMORANDUM OPINION BY**
**SENIOR JUDGE LEADBETTER**     **FILED: January 30, 2020**


    This action arises from events surrounding the suppression (i.e., "closure") and merger[1] of the former Roman Catholic Congregation of Saint Anthony Church (Saint Anthony or Saint Anthony Parish) in Monongahela,

---

[1] Suppression is a canonical process whereby a Roman Catholic parish is disbanded. In this case, Saint Anthony was suppressed and merged with another parish to form Saint Damien of Molokai Parish in Monongahela, Washington County.

An opinion in a similar case, *Pagac v. Diocese of Pittsburgh* (Pa. Cmwlth., No. 1351 C.D. 2018, filed January 30, 2020), is being issued concurrently.

Washington County.  Parishioners[2] of Saint Anthony, brought this action on behalf of themselves and Saint Anthony Parish against the Diocese of Pittsburgh, which oversaw Saint Anthony, and the Bishop of the Diocese, David A. Zubik, who issued the decree suppressing and merging Saint Anthony.  The action, which included four counts seeking monetary damages and one seeking injunctive relief,[3] was dismissed by order of the Court of Common Pleas of Washington County (trial court) granting the Diocese's and Bishop Zubik's preliminary objections.

Parishioners' allegations may be summarized as follows.  Saint Anthony Parish was established in 1904 to serve the Italian community of Monongahela.  Beginning in 2007, the Diocese began to study options to reconfigure parishes in the Monongahela Valley.  During this time period, the Diocese created a project called "Church Alive!" which was designed to raise funds from parishes, including Saint Anthony, that were, unbeknownst to their parishioners, slated for closure.  The "Church Alive!" program continued to solicit and receive funds from Saint Anthony's parishioners for two years, until the Diocese's study for closures and realignment was completed in 2009.  Among the study's recommendations was the merger of Saint Anthony with another parish, which was opposed by parishioners of Saint Anthony.  In August 2011, Bishop Zubik made the formal recommendation to close Saint Anthony by merger with the other parish.

---

[2] The Diocese and Bishop Zubik argue that the Parish ceased to exist upon suppression and that Appellants are no longer parishioners of Saint Anthony Parish.  Irrespective of this, as Bishop Zubik and the Diocese do at several points in their brief, we refer to these individuals as "Parishioners" for descriptive purposes.

[3] Count I—Fraud; Count II—Breach of Fiduciary Duty; Count III—Conversion; Count IV—Unjust Enrichment; and Count V—Injunctive Relief.

The Diocese and Bishop Zubik planned over an extended period of time to merge Saint Anthony and Transfiguration Parishes in Monongahela, culminating in an August 2011 decree merging the two parishes to create Saint Damien of Molokai Parish housed at the former Transfiguration Parish building. Parishioners allege that during the process, the Diocese raised funds and solicited contributions from the suppressed parishes; that they were misled to believe that there was a possibility that the former Saint Anthony facility might be kept open as a place of worship; that they were excluded from discussions concerning the sale of the Saint Anthony facility; that the meetings were overseen and run to ensure that the plan to sell the Saint Anthony facility proceeded; that the Diocese and its representatives misled Parishioners to believe that if enough funding was raised, the facility might remain open; that Parishioners continued to raise funds and make weekly donations; and that Parishioners pursued appeals of the merger, including a canonical appeal to the Vatican.

In March 2014, Bishop Zubik issued a decree closing Saint Anthony. Parishioners filed an appeal to the March 2014 decree that was denied by the Episcopal Vicar for Canonical Services. The March 2014 decree cited Saint Anthony's financial situation as the main reason for its closure. Parishioners assert that the claimed financial distress was a falsehood, with debt found in a 2010 audit being reduced from about $140,000 to $44,000 in one year through special fundraising for this effort. In addition they asserted that the pastor for Saint Damien of Molokai refused a private donor's offer to extinguish the remaining debt on Saint Anthony's facility, stating that such funds would be redirected toward other concerns. Parishioners took issue with several other aspects of Bishop Zubik's decree, asserting that contrary to the Bishop's statements, Saint Anthony's facility was in much better condition and had a location superior to the former Transfiguration where the combined parish is housed. Parishioners believed that the

3

decision to close Saint Anthony rather than Transfiguration was driven by the potentially higher value of the Saint Anthony's facility if sold.

Parishioners filed their action in the trial court in January 2017. The Diocese and Bishop Zubik filed preliminary objections to the effect that the controversy was not ripe; that the trial court lacked subject matter jurisdiction due to the constitutional "deference rule"; that Parishioners lacked standing; and that each count was not legally sufficient (demurrer). After argument and briefing, the trial court sustained the preliminary objections with respect to lack of subject matter jurisdiction and dismissed Parishioners' complaint with prejudice by order dated October 19, 2017. (Reproduced Record "R.R." 153-59a.) This appeal ensued.[4] The trial court issued an opinion under Pennsylvania Rule of Appellate Procedure 1925(a) upholding dismissal for lack of subject matter jurisdiction and additionally finding that Parishioners lacked standing. (R.R. 187-99a.)

On appeal, Parishioners raise the following issues:[5]

(1) Whether the trial court erred in determining that it lacked subject matter jurisdiction under the deference rule; and

(2) Whether the trial court erred in concluding that Parishioners lacked standing.

For the reasons set forth below, we affirm in part and reverse in part.

---

[4] Parishioners' appeal was filed in the Superior Court in November 2017. After the submission of briefs and the reproduced record, the matter was transferred to the Commonwealth Court pursuant to Pennsylvania Rule of Appellate Procedure 751.

[5] These issues present questions of law over which we exercise plenary review. *Phillips v. A–Best Products Co.*, 665 A.2d 1167, 1170 (Pa. 1995).

4

The courts of this Commonwealth have confronted several cases in the past similar to the one at bar and have routinely relied upon what is commonly referred to as the Act of 1935,[6] 10 P.S. § 81, in holding that members of a Roman Catholic parish lack standing to challenge the suppression or dismemberment of a parish. *St. Peter's Roman Catholic Parish v. Urban Redev. Auth. of Pittsburgh*, 146 A.2d 724, 726 (Pa. 1958) (*St. Peter's*) (settlement for condemnation of church building); *Post v. Dougherty*, 191 A. 151, 153 (Pa. 1937) (suppression of a parish); *Canovaro v. Bros. of Order of Hermits of St. Augustine*, 191 A. 140, 145 (Pa. 1937) (dismemberment of a parish); *Croatian Roman Catholic Church of the Holy Trinity Congregation, Ambridge, Beaver Cty., Pa. v. Wuerl*, 668 A.2d 1151, 1152-53 (Pa. Super. 1995) (*Holy Trinity Church*) (suppression of parishes). The Act of 1935 provides in salient part:

> Whensoever any property . . . has . . . been . . . conveyed to any . . . bishop . . . for the use of any church [or] congregation . . . for . . . religious worship . . . , the same shall be taken and held subject to the control and disposition of such officers and authorities of such church . . . , having a controlling power according to the rules . . . of such church, . . . which control and disposition shall be exercised in accordance with and subject to the rules and regulations, usages, canons, discipline[,] and requirements of the religious body . . . to which such church . . . shall belong.

Based on the Act of 1935 and the binding precedent applying it, we must agree with the trial court that Parishioners lack standing to interfere with the suppression of Saint Anthony or its merger into Saint Damien of Molokai. Therefore, we affirm the dismissal of Count V seeking an injunction to bar the merger.

---

[6] Section 7 of the Act of April 26, 1855, P.L. 328, *as amended*, 10 P.S. § 81. The aforementioned section was substantially amended by the Act of June 20, 1935, P.L. 353, which has become synonymous with the provision despite its original enactment date.

Nor, we believe, can Parishioners recoup their contributions under theories of breach of fiduciary duty, unjust enrichment, or conversion. Parishioners' allegations implicitly acknowledge that the moneys given were, as it is put in the Act of 1935, "[personal] property . . . conveyed to . . . [a] bishop . . . for the use of [a] church . . . for religious worship."  10 P.S. § 81. Thus, under the Act of 1935 Bishop Zubik owned the property given to Saint Anthony in trust for the Parish and alone may dispose of it in accordance with the Canons of the Roman Catholic Church. Therefore, "[t]he dispositive rule is that [a] plaintiff, as a parish or congregation, has no standing to sue." *St. Peter's*, 146 A. at 726. We must emphasize here that Parishioners do not suggest that the money they raised and donated was held or used for anything other than activities of the Diocese and its various churches.  That being the case, while Parishioners find the use of their donations contrary to their intent as well as unwise and unfair, our statutory and case law does not allow them to challenge the Bishop's discretion in this regard.

Moreover, Parishioners' standing is further diminished as a result of the suppression. Our Supreme Court has held that any rights in a church's property that its parishioners may have arise only out of their membership, and are extinguished in the suppression or dismemberment. "The effect of the suppression of [a] parish [is] to cause the lay members to lose their membership therein . . . . Having lost their membership in the parish, they have no standing to maintain a bill in equity to enforce any property rights which they may have had in their former capacity . . . ." *Post*, 191 A.2d at 153.  While these authorities are admittedly old and, in some circumstances may seem inequitable, they have not been overturned and we are bound by them. As the Superior Court has stated, Parishioners' devotion to their parish "can neither confer upon the civil courts jurisdiction over an ecclesiastical matter nor cloak appellants in these cases with standing where none exists." *Holy Trinity Church*, 668 A.2d at 1152. Accordingly, we must affirm the trial court's

6

dismissal of Counts II (breach of fiduciary duty), III (Conversion) and IV (unjust enrichment).

However, we conclude that Count I (fraud) may go forward. Parishioners have alleged that Bishop Zubik made knowingly fraudulent misrepresentations which caused them to part with their money. At this point we must assume these allegations to be true. Such conduct, *if proven*, certainly can be said to "contravene the law of the land," *Saint Peter's*, 146 A.2d at 726.[7] The fraud claim stated here is not subject to the "deference rule," by which the trial court found that it lacked subject matter jurisdiction. According to the deference rule, "civil courts decline to exercise jurisdiction over cases that would require them to decide ecclesiastical questions." *See Connor v. Archdiocese of Philadelphia*, 975 A.2d 1084, 1088 (Pa. 2009) (explaining in depth the origins and application of the deference rule under Pennsylvania and federal jurisprudence). Parishioners argue that the trial court has jurisdiction over the allegedly non-ecclesiastical, tortious acts which led up to the suppression. Parishioners suggest application of the "neutral principles of law approach," which applies civil law principles to suits that are "not

---

[7] This stands in sharp contrast to *St. Peter's*, a case in which the then-Bishop of the Diocese of Pittsburgh agreed to a settlement in the condemnation and demolition of a parish. Our Supreme Court concluded its discussion of the standing of the plaintiffs as follows:

> The members of the plaintiff parish are bound by the Act of 1935 and by [*Post and Canovaro*]. They have not alleged that the action of the defendant Bishop contravenes the canons of the Church or the law of the land. The power to dispose of this Church property is therefore exclusively in him. Nor has plaintiff in any way impugned the action of the Bishop as being against the prescribed process of the Church or as being in bad faith, but rather in its answer to the preliminary objections has expressly excepted him from any imputation of fraud.

*St. Peter's*, 146 A.2d at 726.

7

predicated on any religious doctrine." *See id.* at 1096-97 [quoting *Presbytery of Beaver-Butler of United Presbyterian Church U.S.A. v. Middlesex Presbyterian Church*, 489 A.2d 1317, 1322 (Pa. 1985) (*Beaver-Butler*)].

*Connor* surveyed at length the history and competing rationales of the deference rule and the neutral principles of law approach, but summarized the current state of the law as follows: "the most thorough and persuasive analyses are yielded by a claim-by-claim, element-by-element approach to the question of whether to apply the deference rule." 975 A.2d at 1102. The Court concluded as follows:

> [I]n determining whether to apply the deference rule, the fact-finding court must: (1) examine the elements of each of the plaintiff's claims; (2) identify any defenses forwarded by the defendant; and (3) determine whether it is reasonably likely that, at trial, the fact-finder would ultimately be able to consider whether the parties carried their respective burdens as to every element of each of the plaintiff's claims without "intruding into the sacred precincts."

*Id.* at 1103 (quoting *Beaver-Butler*, 489 A.2d at 1321). The elements of fraud are as follows:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

*Gibbs v. Ernst,* 647 A.2d 882, 889 (Pa. 1994).

Obviously, at this early stage of the litigation Bishop Zubik and the Diocese have not filed an answer wherein affirmative defenses would be raised, but to the extent a defense has been stated, it is that the relief requested by Parishioners

8

would require the Court to examine and analyze Canon Law with respect to the underlying decision to suppress Saint Anthony.

We are cognizant that examining the underlying decision to suppress Saint Anthony would require the sort of inquiry that the Diocese and Bishop Zubik caution against, and on that ground have affirmed the dismissal of four of the five counts of Parishioners' complaint. However, while the Bishop and the Diocese may have had the right under the law to do as they saw fit with regard to merging the parishes and dealing with church property, they did not have the right to take the Parishioners' money under false pretenses, and the latter claim can be litigated without intruding into the former actions to which deference is owed. In other words, accepting the allegations of the complaint, as we must, we do not see the deference rule as an impediment to the inquiry as to whether Parishioners were defrauded. Therefore, at this preliminary stage we must allow this litigation to go forward.[8]

Accordingly, we will reverse the dismissal of Count I and remand for further proceedings on the claim of fraud.[9]

_____
**BONNIE BRIGANCE LEADBETTER,**
Senior Judge

Judge McCullough did not participate in the decision for this case.

_____

[8] What remedy Parishioners may be able to obtain is not at issue here. As noted above, they cannot recoup their contributions given to the Church, but *if* they can prove their claim that the Diocese and Bishop Zubik *knowingly perpetrated a fraud*, they may be able to obtain punitive or other damages.

[9] The Diocese and Bishop Zubik argue that the case is not ripe because of ongoing proceedings under Canon Law administered by authorities of the Roman Catholic Church. The Diocese and Bishop Zubik do not cite, and our own research does not disclose, any authority preventing the civil claim for fraud in this case from proceeding.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Laura M. Magone, Barbara Falappi,     :
Joseph Ravasio, Jean J. Rieppi, and     :
Kimberly A. Yarvorsky, Individually and  :
on Behalf of the Roman Catholic      :
Congregation of Saint Anthony,     :
               Appellants     :
                       :
         v.          : No. 1351 C.D. 2018
                       :
The Diocese of Pittsburgh, and the     :
Most Reverend David A. Zubik,      :
Diocesan Bishop             :

# O R D E R

AND NOW, this 30th day of January, 2020, the order of the Court of Common Pleas of Washington County is AFFIRMED in part and REVERSED in part and this matter is REMANDED in accordance with the foregoing opinion.

Jurisdiction is relinquished.

The Diocese of Pittsburgh's and Bishop David A. Zubik's Application for Leave to File Post-Argument Memoranda is DISMISSED AS MOOT.

 

 

_____
**BONNIE BRIGANCE LEADBETTER,**
Senior Judge